MATTHEW RIGHETTI, ESQ., SBN 121012
JOHN GLUGOSKI, ESQ., SBN 191551
RIGHETTI GLUGOSKI, PC
456 Montgomery St., Suite 1400
San Francisco, CA  94101
Telephone: (415) 983-0900
Facsimile:  (415) 397-9005

REUBEN D. NATHAN, ESQ. SBN 208436
NATHAN & ASSOCIATES, APC
600 W Broadway Suite 700
San Diego, CA 92101-3370
Telephone: (619) 272-7014
Facsimile: (619) 330-1819

ROSS CORNELL, ESQ., SBN 210413
111 W. Ocean Blvd., Suite 400
Long Beach, CA  90802
Telephone:  (562) 612-1708
Facsimile: (562) 394-9556

DAVID BORGEN, ESQ., SBN 99354
JAMES KAN, ESQ., SBN 240749
GOLDSTEIN BORGEN DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612-3536
Telephone: (510) 763-9800
Facsimile: (510) 835-1417

MICHAEL MALK, ESQ., SBN 222366
MALK LAW FIRM
1180 S. Beverly Dr., Suite 302
Los Angeles, CA  90035
Telephone: (310) 203-0016
Facsimile:  (310) 499-5210

Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ADAM SHAW, PETER GOLIGHTLY, JUSTIN TURNER and JOSHUA STANSFIELD as individuals and on behalf of all others similarly situated and the general public,

Plaintiffs,

v.

WIZARDS OF THE COAST, LLC,

Defendant.

Case No.:  5:16-cv-01924-EJD
Hon. Edward J. Davila

**COLLECTIVE AND CLASS ACTION**

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CONDITIONAL CERTIFICATION AND TO FACILITATE NOTICE UNDER 29 U.S.C. § 216(b); MEMORANDUM OF POINTS AND AUTHORITIES**

Date: November 9, 2017
Time: 9:00 a.m.
Courtroom: 4

1

**TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on November 9, 2017 at 9:00 a.m. in Courtroom 4 before the Hon. Judge Edward J. Davila of the United States District Court, Northern District of California, San Jose Courthouse, 5th Floor, 280 South 1st Street, San Jose, CA 95113, Plaintiffs Adam Shaw, Justin Turner, Peter Golightly and Joshua Stansfield ("Plaintiffs") will move the Court as follows:

1.      For an order conditionally certifying this case as a collective action on behalf of all individuals who participated as Magic: the Gathering judges at events sanctioned by Wizards of the Coast, LLC from April 12, 2013, through the resolution of this case;

2.      Authorizing the parties to send notices pursuant to 28 U.S.C. Section 216(b) to all potential opt-in plaintiffs that they may join this action and assert claims under the Fair Labor Standards Act, 29 U.S.C. section 206;

3.      Approving Plaintiffs' proposed Notice of Collective Action Lawsuit and Consent to Join forms;

4.      Ordering Defendant to Produce a Putative Collective Action Member List setting forth the last known addresses, telephone numbers, email addresses, dates of training, and partial social security numbers of all putative collective action members within fourteen (14) days this Court grants Plaintiffs' Motion for Conditional Certification, if this Court is inclined to do so;

5.      Approving the designation of Kurtzman Carson Consultants ("KCC") as the Class Administrator responsible for, among other things, distributing the Notice of Collective Action Lawsuit and processing the returned Consent to Join forms on behalf of the collective, and authorizing electronic signatures on the Consent to Join form by potential opt-in plaintiffs.

This Section 216(b) Motion is based on this notice of motion, the following supporting authority and arguments, the Declaration of Adam Shaw in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Shaw Decl."), the Declaration of Justin Turner in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Turner Decl."), the Declaration of Peter Golightly in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Golightly Decl."), the Declaration of Joshua Stansfield in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Stansfield Decl."), the Declaration of Brad Rutherford in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Rutherford Decl."), and the Declaration of Tyler

Morrison in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Morrison Decl.").

Accompanying this motion are also: (1) Plaintiffs' Proposed Notice of Collective Action Lawsuit; and (2) Plaintiffs' Proposed Opt-in Consent Form, attached to the Declaration of Ross Cornell in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Cornell Decl.") as Exhibits S and T, respectively, and Plaintiffs' Proposed Order Granting Plaintiffs' Motion for Conditional Class Certification and to Facilitate Notice under 29 U.S.C. § 216(b).

Dated:  June 14, 2017            By:     /s/Matthew Righetti
                                              Matthew Righetti, Esq.
                                              RIGHETTI GLUGOSKI, PC
                                                456 Montgomery St., Suite 1400
                                              San Francisco, CA  94101
                                              Telephone: (415) 983-0900
                                              Facsimile:  (415) 397-9005

                                              Attorneys for Plaintiffs, the Proposed Collective
                                              and the Putative Classes

**Table of Contents**

I.     PRELIMINARY STATEMENT……………………..…………………………......7

II.    FACTUAL BACKGROUND……………………………………………………...8

    A.    Plaintiffs And All Similarly Situated Magic Judges Perform Valuable Work
        That Benefits Wizards…………………………………………………………..8

    B.    Magic Judges Are Uniformly Subject to Wizards' Rigorous Training and
        Certification Requirements……………………………………………………..10

    C.    Magic Judges Engage in Similar Job Duties and Responsibilities………………..11

    D.    Magic Judges Work Similar Shifts…………………………………………..12

    E.    Magic Judges Are Subject to the Same Compensation and Expense
        Reimbursement Policies…………………………………………………......13

    F.    Magic Judges Are Subject to Common Policies Regarding Conduct, Discipline and
        Uniforms……………………………………………………………………..15

    G.    Wizards Regards Magic Judges As Its Representatives To Magic Players
        And Tournament Organizers…………………………………………….......16

    H.    One Hundred Twenty Six Individuals Have Already Opted Into This
        Collective Action and Many More Are Expected to Join Once Notice Is Sent……...17

III.   ARGUMENT……………………………………………………………….......17

    A.    The FLSA Permits Collective Actions to Prohibit Unlawful Labor Practices………17

    B.    In Determining Whether Plaintiffs Are Similarly Situated, the Courts in
        the Ninth Circuit Utilize a Two-Step Approach…………………………….......18

    C.    This Case Should Be Conditionally Certified Because Plaintiffs Have
        Made Substantial Allegations to Justify Court-Facilitated Notice to the
        Putative Opt-ins…………………………………………………………...20

    D.    Courts Have Conditionally Certified Similar Volunteer Cases……………………..20

    E.    Notice is Appropriate and Necessary to Protect Collective Members' Rights………21

    F.    Defendant Should be Compelled to Produce Contact Information for the
        Putative Opt-Ins…………………………………………………………….22

IV. CONCLUSION………………………………………………………………..23

1

### Table of Authorities

2

**STATUTES**

3
29 U.S.C. §§ 202(a), 206, 207 and 216(b)…………………………………………………*passim*

4

29 U.S.C. § 255(a)………………………………………………………………………..23
5

6

**CASES**

7
*Adams v. Inter-Con Sec. Sys. Inc.*, 242 F.R.D. 530 (N.D. Cal. 2007)………………………………18

8

*Banks v. Robinson,* No. 2:11-cv-00441, 2011 WL 3274049 (D. Nev. July 28, 2011)……………...17

*Bao Yi Yang v. Shanghai Gourmet, LLC*, 471 Fed. Appx. 784 (9th Cir. 2012)……………………17

9

*Barrentine v. Arkansas-Best Freight Sys. Inc.*, 450 U.S. 728 (1981)………………………………..6

10

*Bonner v. SFO Shuttle Bus Co., 2013 WL 6139758 (N.D. Cal. Nov. 21, 2013)…………..………....21*

11

*Browning v. Yahoo! Inc.* 2006 WL 3826714 (N.D. Cal. December 27, 2006)…………..………..22

12

*Bureerong v. Uvawas*, 922 F. Supp. 1450 (C.D. Cal. 1996)…………..………………………….18

13

*Davis v. Soc. Serv. Coordinators, Inc.*, No. 1:10-CV-02372, 2012

        WL 5838825 (E.D. Cal. Nov. 15, 2012)…………..………..……..………………….…..22

14

*Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000)…………..………..18

15

*Gallagher v. Lackawanna County*, No. 3:CV-07-0912, 2008

16

        WL 9375549 (M.D. Pa. May 30, 2008)………………………………..……………..…..23

17

*Gomez v. H & R Gunlund Ranches, Inc.*, No. CV F 10-1163,

18

        2010 WL 5232973 (E.D. Cal. 2010)……………….…..………………………….…..21

*Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835 (N.D. Cal. 2010)…………………………...18, 19

19

*Helton v. Factor 5, Inc.*, No. C 10-04927, 2012 WL 2428219

20

        (N.D. Cal. June 26, 2012)…………………………………………………………….19

21

*Hallissey v. Am. Online, Inc.*, No. 99-CIV-3785 (KTD),

22

        2008 WL 465112 (S.D.N.Y. Feb. 19, 20008)……………….………..……………….20, 21

23

*Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989)………………………...…………18, 21

24

*In re Apple IPhone 4 Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 113876

25

        (N.D. Cal. Aug. 10, 2012) (email notice to 15.7 million persons and publication)…………..22

*In re Netflix Privacy Litig.*, 2012, U.S. Dist. LEXIS 93284 (N.D. Cal. Jul. 5, 2012) ………………22

26

*In re Wells Fargo Home Mortg. Overtime Pay Litig.* 527 F. Supp. 2d 1053 (N.D. Cal. 2007) ……...19

27

*Russell v. Wells Fargo & Co.,* No. C 07-3993 CW, 2008 WL 4104212 (2008)…………….………19
28

*Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124 (N.D. Cal. 2009)……………………………………19, 22

*Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462 (N.D. Cal. 2004)…………..………………...17, 19

*Mitchell v. Acosta Sales, LLC*, 841 F. Supp. 2d 1105 (C.D. Cal. 2011)………..…………………….22

*Mooney v. Aramco Servs.*, 54 F.3d 1207 (5th Cir. 1995)……………………………………………19

*Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468 (E.D. Cal. 2010)……………………………18, 19

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)…………………………………………7

*Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606 (D. Conn. 2007)………………………23

*Otey v. Crowdflower Inc.* 2013 WL 4552493 (N.D. Cal. Aug 27, 2013)………..…………………….22

*Ramirez v. P&H Forestry, LLC*, 515 F. Supp. 2d 937 (W.D. Ark. 2007)……………………20, 23

*Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623 (D. Colo. 2002)……………………………………20, 21

*Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474 (E.D. Cal. 2006)…………………………23

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)……………………………………………7

*Sanchez v. Sephora USA, Inc.*, 2012 WL 2945753 (N.D.Cal.2012)…………………………………22

*Shaia v. Harvest Mgmt. Sub LLC*, 306 F.R.D. 268 (N.D. Cal. 2015)………..…………………….19

*Smith v. Bimbo Bakeries USA, Inc.*, No. CV 12-1689, 2013 WL 4479294 (C.D. Cal. Aug. 19,
   2013)……………………………………………………………………………………………23

*Solis v. Washington*, 656 F.3d 1079 (9th Cir. 2011)……………………………..…………………17

*Vasquez v. Coast Valley Roofing, Inc.*, 670 F.Supp.2d 1114 (E.D. Cal. 2009)………………………..18

*Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067 (C.D. Cal. 2002)…………………………18, 19

*Zaborowski v. MHN Gov't Servs.*, No. C 12-05109, 2013 WL 1787154 (2013)………………….....18

**TREATISES**

*Wright, Miller, & Kane, Federal Practice and Procedure* Vol. 7B § 1807 (3d ed. 2005)……………..7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    PRELIMINARY STATEMENT

Plaintiffs Adam Shaw, Justin Turner, Joshua Stansfield, Peter Golightly, one hundred twenty-six (126) opt-in Plaintiffs and the putative collective ("Plaintiffs") bring the instant wage and hour collective action litigation to recover unpaid minimum wages and overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207 and 216(b), for work they performed as Judges on behalf of Wizards of the Coast, LLC (hereinafter as "Wizards," or the "Defendant").

Congress enacted the FLSA as a remedial measure "to protect all covered workers from substandard wages and oppressive working hours, labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-being of workers." *Barrentine v. Arkansas-Best Freight Sys. Inc*., 450 U.S. 728 739  (1981); 29 U.S.C. § 202(a).  In light of this remedial purpose, the FLSA broadly defines "employ" as "to suffer or permit to work." 29 U.S.C. 203(g). The "striking breadth" of this definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344 (1992) (*citing Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)).

Considering this broad definition, Plaintiffs allege that they and the Collective performed work as employees – thousands of hours of work that benefited the Defendant and without which the Defendant could not have conducted its highly profitable business – and that the Defendant misclassified members of the Collective as exempt from minimum wage and overtime requirements on a class-wide basis.

Section 216(b) of the FLSA provides a private cause of action against an employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Unlike class actions under Rule 23, collective actions under the FLSA require putative class members to opt into the case. *See id*. ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.")  These opt-in employees are party plaintiffs, unlike absent class members in a Rule 23 class action. *See Wright, Miller, & Kane, Federal Practice and Procedure* Vol. 7B § 1807 at 474 n.13 (3d ed. 2005).

The three-year statute of limitations for an FLSA claim runs from the date a non-Named Plaintiff "opts-in" to the action.[1]  In light of the fact that the statute of limitations for an individual's FLSA claim continues to run even after a lawsuit is commenced, courts routinely endorse court-authorized notice early in the litigation to notify individuals about their FLSA claims and ensure that their rights do not expire during the discovery period.  Plaintiffs make the instant application simply to request court-authorized notice be published to the putative collective to notify them of the pendency of this action and of their rights under the FLSA.

Accordingly, Plaintiffs seek an Order pursuant to 29 U.S.C. § 216(b), authorizing Plaintiffs to send notice to the following similarly situated individuals:

All current and former judges who worked at Magic: the Gathering events sanctioned[2] by Wizards of the Coast, LLC from April 12, 2013 through the present (the "Collective").

## II.     FACTUAL BACKGROUND

### A.      Plaintiffs And All Similarly Situated Magic Judges Perform Valuable Work that Benefits Wizards

Wizards is a private sector, for-profit enterprise that sells products relating to a collectible card game called Magic: the Gathering ("Magic").  The Plaintiffs worked as unpaid Judges for Wizards, overseeing its highly regulated system of tournaments, game nights and events relating to Magic. Magic events are used by Wizards as a marketing tool to actively engage players in Magic and to provide a means to sell Magic products.  *See* Declaration of Justin Turner in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Turner

---

[1] The FLSA differs from a Rule 23 class action, where class members' claims run from the date the lawsuit was filed.

[2] Wizards-sanctioned events fall into one of three Rules Enforcement Levels ("REL"): "Regular," "Competitive," or "Professional." The Rules Enforcement Level is "a means to communicate to the players and judges what expectations they can have of the tournament in terms of rigidity of rules enforcement, technically correct play, and procedures used … [t]he Rules Enforcement Level of a tournament generally reflects the prizes awarded and the distance a player may be expected to travel." Cornell Decl. Ex. G [PLF1045, 1088].  The class definitions set forth in Plaintiff's First Amended Complaint [ECF No. 33, 7:21-8:13] erroneously designated "Regular" REL as "Amateur" REL. Plaintiffs have since filed a Joint Stipulation re Notice of Errata correcting that error [ECF Nos. 44, 45].

1  Decl.") ¶ 6 [2:19-20]; Declaration of Brad Rutherford in Support of Plaintiffs' Motion for Conditional
2  Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Rutherford Decl.") ¶ 5 [1:17-20];
3  Declaration of Tyler Morrison in Support of Plaintiffs' Motion for Conditional Certification and to
4  Facilitate Notice Under 29 U.S.C. § 216(b) ("Morrison Decl.") ¶ 9 [2:18-21];  Declaration of Ross
5  Cornell in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29
6  U.S.C. § 216(b) ("Cornell Decl.") Ex. P [PLF1124] ("[p]layers who compete in DCI-sanctioned
7  tournaments spend 43% more on Magic cards than non-tournament players").[3] Wizards charges Judges
8  with the responsibility of being the arbiters of Magic tournaments by ensuring that the game is played
9  fairly and that players adhere to Wizard's rules.  *Id.*; Cornell Decl. Ex. B [PLF1007], Ex. E [PLF1031]
10 ("A judge is someone who upholds [Wizards'] values and … help run tournaments, deliver rulings …
11 Judges hold special positions of trust and authority within the community … [they] enforce the rules,
12 award penalties, and even disqualify players).  Wizards analogizes Magic judges to "sports referees."
13 *Id.* Ex. C [PLF1021] ("[b]asically, the judge at a tournament is the person responsible for keeping the
14 game fair (much like the referee in any other sport), applying the rules, correcting and penalizing any
   infractions, answering questions and assisting players in tournament matters"); Morrison Decl. ¶¶ 5, 10
   [1:18-20; 3:1-15].

15         As Wizards concedes, the life of a judge means "getting into an interesting activity that's both
16 fun and a lot of work."  Cornell Decl. Ex. C [PLF1025].  Wizards further admits that being a Judge
17 "demands dedication, commitment, and constantly keeping up with the new things that come with the
18 evolution of the game," "demands a professional attitude," and is "a matter of responsibility."  *Id.* Ex.
19 C [PLF1022].  Wizards' website contains a link called "Find a Judge" where retail store operators who
20 host Magic events (referred to in the Magic community as "Tournament Organizers") can go to find a
   judge to work at sanctioned events in their stores.  *Id.* Ex. D [PLF1026-1029], Ex. G [PLF1041-1043].

21
22
23
---
[3] The "DCI" is the official sanctioning body for Magic competitive play.  Cornell Decl. Ex. L
24 [PLF1102].  Wizards issues "DCI numbers" that allow players, judges and tournament organizers to
   interact with Wizards' electronic data systems.  Cornell Decl. Ex. Q [PLF1143].  Wizards defines a
25 "sanctioned" Magic event as: "[a]ny event that is scheduled by an authorized tournament organizer and
26 whose results are properly reported to Wizards of the Coast."  Cornell Decl. Ex. A [PLF1001].
   Wizards' repeated reference to "sanctioned" events on its website underscores the significance of this
27 distinction.  Cornell Decl. Ex. K [PLF1101].  Wizards summarizes its rules for "sanctioned" events in
28 its Tournament Rules.  Cornell Decl. Ex. G [PLF1075-1077].

1

2

**B.    Magic Judges Are Uniformly Subject to Wizards' Rigorous Training and Certification Requirements**

3

4

5

6

7

8

9

Wizards requires Magic judges obtain certification in order to run sanctioned Magic events.  *Id*. Ex. J [PLF1096] ("[t]he core of the Judge Program, the level system, affects every judge"); Rutherford Decl. ¶ 6 [1:24-26].  The certification criteria, which is determined by Wizards, is uniformly applied to Magic judges for each respective judge level and ranges from requiring study of various Wizards policy documents and passing written exams to mentoring lower level Judges and serving as brand ambassadors for Wizards.  Cornell Decl. Ex. J [PLF1096-1100]; Morrison Decl. ¶¶ 7, 14 [2:3-11, 4:20-22]; Rutherford Decl. ¶¶ 7, 11 [1:27-2:6, 3:16-18].  Wizards advises Judges to "study well and prepare yourself for the events in which you will work."  Cornell Decl. Ex. C [PLF1025].

10

11

12

13

14

15

16

17

18

The requirements for certification as a Magic judge are substantial.  Becoming a level 1 Judge requires dozens of hours of study time, taking a written test which lasts several hours, judging at least two Magic events, spending hours being mentored by a higher level judge and at least one hour per week involved in non-judging activities with the goal of helping Wizards build the Magic community.  Turner Decl. ¶ 13 [3:14-24]; Declaration of Adam Shaw in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Shaw Decl.") ¶ 8 [2:23-3:6]; Declaration of Peter Golightly in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Golightly Decl.") ¶ 12 [3:3-12]; Declaration of Joshua Stansfield in Support of Plaintiffs' Motion for Conditional Certification and to Facilitate Notice Under 29 U.S.C. § 216(b) ("Stansfield Decl") ¶ 14 [3:21-4:3]; Morrison Decl. ¶ 6 [1:25-2:2]; Rutherford Decl. ¶ 7 [1:27-2:6].

19

20

21

22

23

24

25

Obtaining certification as a level 2 judge requires an even greater time commitment.[4]  To become a level 2 judge, Wizards requires a candidate to pass comprehensive testing on over three hundred (300) pages of detailed written materials including Wizards' Tournament Rules, Comprehensive Rules, and Infraction Policy Guide and to work enough events as a level 1 judge to obtain the approval and recommendation of other higher level judges.  Turner Decl. ¶ 14 [3:24 - 4:2]; Shaw Decl. ¶ 9 [3:6 -11]; Golightly Decl. ¶ 13 [3:12-17]; Stansfield Decl. ¶ 15 [4:4 - 8]; Morrison Decl. ¶ 7 [2:3-11]; Rutherford Decl. ¶ 7 [2:4-6].

26

27

28

---

[4] Level 2 judges are qualified to judge competitive Magic events and "are responsible for PPTQs and represent the bulk of judges on the floor of a Grand Prix and other large-scale tournaments."  Cornell Decl. Ex. J [PLF1099].

Once certified, Wizards requires all Judges to continuously maintain their certification.  Cornell Decl. Ex. C [PLF1022], Ex. J [1096-1110].  Roughly every three months, Judges must study and understand Wizards-issued updates and changes to its gameplay rules and policies.  Turner Decl. ¶ 15 [4:3-7] (it takes judges at least 10 hours each quarter to read, get trained on, and stay apprised of policy changes implemented by Wizards regarding Magic gameplay and judging); Stansfield Decl. ¶ 14 [3:18-22]; Shaw Decl. ¶ 10 [3:11-16]; Golightly Decl. ¶ 14 [3:17-22]; Morrison Decl. ¶ 8 [2:12-17]; Rutherford Decl. ¶ 8 [2:7-14].  Wizards maintains a database that tracks all of the events worked by judges.  This database, called OPIS, tracks Magic judges at event, players at event, match records of players, penalties of the players, each round of each tournament, and disqualifications.  Turner Decl. ¶ 18 [5:1-3]; Stansfield Decl. ¶ 19 [5:7-9]; Golightly Decl. ¶ 17 [4:16-18]; Shaw Decl. ¶ 14 [4:13-15]; Morrison Decl. ¶ 12 [3:24-27].

### C.    Magic Judges Engage in Similar Job Duties and Responsibilities

Magic Judges working at sanctioned Magic events are the labor force that permits those events to function.  Turner Decl. ¶ 17 [4:18-21] (Wizards could not conduct Magic events without hundreds of judges performing substantial labor); Stansfield Decl. ¶ 18 [4:24-27]; Shaw Decl. ¶ 13 [4:3-6]; Golightly Decl. ¶ 16 [4:5-6]; Rutherford Decl. ¶ 9 [2:15-3:3]; Morrison Decl. ¶ 10 [3:1-15].  These sanctioned events include Friday Night Magic, Prerelease Tournaments, Magic Game Day, Preliminary Pro Tour Qualifiers, Magic Grand Prix, Grand Prix, Nationals, Pro Tour, World Magic Cup, and World Championship, among others.  Turner Decl. ¶ 17 [4:21-24]; Cornell Decl. Ex. G [PLF1088].

Judges carry out the vast majority of work activities at sanctioned Magic events by not only administering and overseeing the gameplay, but also handling numerous aspects of event logistics.  At any Wizards sanctioned event, Judges engage in similar work duties, which include monitoring gameplay to ensure that it complies with Wizards' set rules, apply Wizards' policies to make decisions in resolving disputes between players, performing "deck checks" to ensure players' cards comply with Magic rules, and recording information about the outcome of gameplay and disputes into Wizards' tracking software.  At larger sanctioned events, Judges have the added responsibilities of setting up and breaking down chairs and tables for players, collecting players' entry fees, posting information about matchups, picking up and taking out trash left by Magic players, cleaning up spills and other messes, and providing general customer service functions like answering questions and providing directions and instructions.  Stansfield Decl. ¶ 17 [4:14-24]; Shaw Decl. ¶ 11 [3:17-26]; Golightly Decl. ¶ 15

11

[3:23-4:5]; Turner Decl. ¶ 16 [4:8-17]; Morrison Decl. ¶ 10 [3:1-15]; Rutherford Decl. ¶ 9 [2:15-3:2].

Wizards summarizes common judging activities at sanctioned events as follows:

"At all levels, judges will keep the game fair, answer rules questions from players at the tournament, correct infractions and apply penalties when necessary. Basically, this will represent most of the judging job, especially at small, local tournaments, where, usually, there is only one judge. Aside from rules matters and players disputes, judges perform some activities related to the tournament organization. Judges post pairings generated by the scorekeeper, check decks and deck lists, keep the tables organized and clearly numbered. They also lend a hand to the [Tournament Organizer] when necessary: making announcements, looking for missing players and finding unreported match results. After all, besides keeping it fair, we need to keep it organized."

Cornell Decl. Ex. C. [PLF1023].

Judges who act as Team Leads have additional duties relating to the management of a team of three to six judges at Wizards' larger events. *Id.* Ex. N [PLF1112]. These duties, as set forth by Wizards, include preparing for rule interactions and policy discussions, conducting team meetings at the start, end, and throughout the day of the tournament, assigning tasks to team members, and ensuring that team members receive proper lunch breaks while maintaining floor coverage. *Id.* Ex. N [PLF1112-1120]. "At large events with many players and many judges, a team structure is often used to split up the judge staff into small task forces, referred to as teams … [w]hile the bulk of a team leader's job happens during the event, preparation is not unimportant." *Id.* Team Leads are required, prior to a Magic event, to determine strengths and weaknesses of team members, team member schedules and duties, where to obtain necessary job materials and prepare for team meetings. *Id.*

### D.      Magic Judges Work Similar Shifts

Wizards determines the schedules for Magic events. There are single-day and multiple-day Magic event formats. Turner Decl. ¶ 17 [4:19-21]; Golightly Decl. ¶ 16 [4:6-8]; Stansfield Decl. ¶ 18 [4:25-27]; Shaw Decl. ¶ 13 [4:3-6]; Morrison Decl. ¶ 9 [2:18-27]. Single-day Magic events tend to involve fewer players and judges and are generally smaller events held at the local level. Cornell Decl. Ex. C [PLF1021]; Morrison Decl. ¶ 9 [2:18-27]. Multiple-day Magic events involve larger numbers of players and judges and tend to be held at larger venues, often in hotels or convention centers. Cornell Decl. Ex. R [PLF1152-1166]; Turner Decl. ¶ 17 [4:23-28]; Shaw Decl. ¶ 13 [4:8-12]; Golightly Decl. ¶ 16 [4:10-15]; Stansfield Decl. ¶ 18 [5:2-7]. There is an approximate 20:1 ratio of Magic players to Magic judges at Magic events. Turner Decl. ¶ 17 [4:26-28].

Because similar Magic events share similar schedules, Judges who work those events also have

similar schedules.  At larger Magic events, such as the ProTour, Grand Prix, World Cup and World Championships, Judges typically work two or three consecutive days with work shifts ranging from eight to twelve hour days.  At smaller events one-day events or evening events, such as Friday Night Magic, Preliminary Pro Tour Qualifiers and Grand Prix Trials, Magic judges typically work six to ten hours.  Shaw Decl. ¶ 15 [4:16-24]; Golightly Decl. ¶ 18 [4:18-26]; Stansfield Decl. ¶ 20 [5:10-18]; Turner Decl. ¶ 19 [5:4-12]; Morrison Decl. ¶ 11 [3:16-23]; Rutherford Decl. ¶ 10 [3:3-11].  Judges' work schedules at sanctioned Magic events is determined by Wizards, whose hiring and scheduling decisions are implemented by head judges operating in accordance with Wizards' policies and procedures and under Wizards' supervision.  Shaw Decl. ¶ 16 [4:24-26]; Golightly Decl. ¶ 19 [4:27-5:2]; Stansfield Decl. ¶ 21 [5:18-20]; Turner Decl. ¶ 20 [5:12-14]; Morrison Decl. ¶ 11 [3:16-18].

### E.    Magic Judges Are Subject to the Same Compensation and Expense Reimbursement Policies

Despite the long-standing requirement that employees must be paid for all hours worked under the FLSA, Wizards has a uniform policy of refusing to pay employee wages to Judges for all the hours they work related to Wizards sanctioned events.  Instead, Wizards treats its Judges as "volunteers" who it compensates, indirectly through its agents, with Magic products or giveaways of variable value. Turner Decl. ¶ 30 [7:5-9]; Morrison Decl. ¶ 13 [4:1-15]; Rutherford Decl. ¶¶ 12, 13 [3:25-4:16].

For most of the class period, Wizards provided "Magic: the Gathering Tournament Support Kits" (hereinafter "Support Kits") to Tournament Organizers desiring to host Magic events.  Cornell Decl. Ex. O [PLF1122].  There are a variety of Support Kits for different kinds of Magic events, each containing different combinations of product and support.  Turner Decl. ¶ 28 [6:21-7:2].  All of the materials provided in the Support Kits are produced by Wizards, including the prizes, which by way of example for Friday Night Magic, consist of "two packs containing 16 exclusive premium [Magic] cards."  Cornell Decl. Ex. O [PLF1122]; Turner Decl. ¶ 31 [7:9-11].  Wizards' policy has been that for each week the Tournament Organizer schedules a Magic event, Wizards will send the Tournament Organizer foil, alternative-art promo cards in quantities determined by [the Tournament Organizer's store level.  Cornell Decl. Ex. H [PLF1089].

Wizards' policies state that product support is intended for distribution to Magic players. Cornell Decl. Ex. H [PLF1091-1092] ("Distribute all promo cards you receive for each Friday, regardless of the number of events you run. You may issue them for any reason, so long as all cards are distributed to your players").    In reality, whether or not Wizards officially earmarks the prizes

13

contained in Support Kits for Magic players, Tournament Organizers rely on the Support Kits to compensate Magic judges for their work as judges at sanctioned Magic events and regularly distribute product support to judges for that purpose and judges, in turn, sell them on a secondary market to attempt and recover their out of pocket expenses.  Turner Decl. ¶¶ 29, 30 [7:2-9]; Shaw Decl. ¶ 28 [6:21-7:2]; Golightly Decl. ¶ 25 [6:1-11]; Stansfield Decl. ¶¶ 26 - 28 [6:17-7:3]; Rutherford Decl. ¶ 13 [4:1-16]; Morrison Decl. ¶ 13 [4:1-15].  For many Magic judges, receiving product from Tournament Organizers has been the only compensation they receive, and Wizards always controlled the giveaways relied on as compensation by judges.  Turner Decl. ¶¶ 29, 30 [7:2-9]; Shaw Decl. ¶ 28 [6:21-7:2]; Golightly Decl. ¶ 25 [6:1-11]; Stansfield Decl. ¶¶ 26 - 28 [6:17-7:3]; Rutherford Decl. ¶ 13 [4:1-16]; Morrison Decl. ¶ 13 [4:1-15].

In agreeing to judge Magic events, Magic judges have generally known in advance exactly how much product to expect as compensation because there is an open and ongoing conversation in the judge community about minimum acceptable thresholds of product compensation. Rutherford Decl. ¶ 13 [4:6-8].  Accordingly, the Wizards' practice is to subsidize the work performed by judges at sanctioned Magic events with product support delivered to Tournament Organizers under the auspices of "player prizes," amidst an environment where everyone involved knows and expects the product support to be used to compensate judges.  *Id.*; Turner Decl. ¶ 30 [7:5-9].  Shortly after this and another lawsuit was filed, Wizards stopped distributing products as compensation for work performed at Magic events.  Rutherford Decl. ¶ 13 [4:13-16].

Magic Judges are and have been subject to the same Wizards compensation policies and practices whereby they are not paid minimum wages or overtime wages for all of the work they perform on behalf of Wizards.  Shaw Decl. ¶ 24 [6:20-7:4]; Stansfield Decl. ¶ 22 [5:25-6:2]; Golightly Decl. ¶ 26 [6:11-16]; Turner Decl. ¶ 22 [6:5-11]; Rutherford Decl. ¶ 12 [3:25-27]; Morrison Decl. ¶ 13 [4:1-5].  Wizards and its agents also uniformly failed to reimburse Judges for all work-related expenses, such as food, travel, or hotel accommodations, incurred while working as a Judge.  Shaw Decl. ¶ 24 [6:20-22]; Golightly Decl. ¶ 28 [6:26-7:4]; Turner Decl. ¶¶ 25-26 [6:10-15]; Rutherford Decl. ¶ 13 [4:10-13]; Morrison Decl. ¶ 13 [4:13-15].  Magic judges rely on Wizards' product giveaways as their sole form of expense reimbursement.  Turner Decl. ¶¶ 29, 30 [7:2-9]; Shaw Decl. ¶ 21 [5:23-6:5]; Golightly Decl. ¶ 25 [6:1-11]; Stansfield Decl. ¶¶ 26 - 28 [6:17-7:3]; Rutherford Decl. ¶ 13 [4:10-13]; Morrison Decl. ¶ 13 [4:13-15].  Thus, Plaintiffs and the putative opt-ins raise common allegations that these compensation and reimbursement policies violate the FLSA, especially since for-profit private sector employers, like Wizards, may not accept volunteer services from employees.

**F.      Magic Judges Are Subject to Common Policies Regarding Conduct, Discipline and Uniforms**

Wizards publishes the Magic Judge Code, Wizards' version of the judge's code of conduct, which sets forth mandatory requirements for Judges including a description of the requisite values and principles of Judge conduct, examples of misconduct, and an explanation of forms of discipline. Cornell Decl. Ex. B [PLF1007] ("[t]his document helps judges understand their responsibilities. It's here to help define what is acceptable and what isn't"). The scope of Wizards' expectations regarding Judge conduct is broad: the Judge Code applies to Judges "[d]oing anything while wearing judge attire, [d]oing anything while representing themself as a judge … using a photo of themself in a judge shirt as their icon on social media or bringing up their judge status in order to gain trust … [c]ontributing to an official judge discussion website." *Id.* Ex. B [PLF1010-1011]; Rutherford Decl. ¶ 11 [3:16-24]; Morrison Decl. ¶ 15 [5:5-9]. Wizards further extends its expectations to "conduct by a judge who is at a Magic event in a non-judge role, a judge who is addressing an audience which is primarily focused on Magic, a judge who is or speaking as a person who is strongly associated with Magic and/or judging … [p]laying or otherwise attending a Magic event in a non-judge capacity, [p]laying, trading, or interacting with others on Magic Online, [p]osting on an unofficial Magic site or Magic related social media … and [a]ttending a social event organized alongside a Magic event." *Id.*

If Wizards determines that a Judge has violated its rules or procedures, Wizards maintains the right to discipline that Judge. Wizards implements sanctions against Judges in the form of suspensions, demotions and decertifications for things such as cheating, prematurely giving away information about to-be-released cards, poor performance reviews, and providing incorrect Judge foils or box sets to Magic players. Cornell Decl. Ex. B [PLF1019]; Turner Decl. ¶ 23 [6:1-5]; Golightly Decl. ¶ 23 [5:19-23]; Stansfield Decl. ¶ 25 [6:12-16]; Shaw Decl. ¶ 19 [5:12-17]; Rutherford Decl. ¶ 11 [3:17-24]; Morrison Decl. ¶ 15 [4:26-5:9]. The full scope of suspensions and decertifications executed against judges by Wizards will be determined in discovery, but even at this early stage Plaintiffs have evidence of at least two dozen judges who have been suspended or terminated by Wizards. Turner Decl. ¶ 32 [7:12-17]; Golightly Decl. ¶ 24 [5:23-28]; Shaw Decl. ¶ 20 [5:17-22].

Wizards also requires Judges to wear uniforms when judging Magic events. "To help maintain the professionalism and look of Magic events, all judging staff members have a distinctive uniform they wear while judging." Cornell Decl. Ex. M [PLF1110]. "The judge uniform and logo make an impression which connects the behavior of the judge using them to the Judge Program." *Id.* Ex. B [PLF1011]. Judges are instructed to wear the uniform, including shirts provided by Wizards, at

15

sanctioned events.  Turner Decl. ¶ 21 [5:19-23]; Golightly Decl. ¶ 21 [5:10-15]; Stansfield Decl. ¶ 23 [6:3-8]; Shaw Decl. ¶ 17 [5:4-9]; Rutherford Decl. ¶ 11 [3:14-16]; Morrison Decl. ¶ 14 [4:22-25].

### G. Wizards Regards Magic Judges As Its Representatives To Magic Players And Tournament Organizers

In addition to their work at sanctioned Magic events, Judges work on behalf of Wizards as representatives to retailers and players, providing them with customer service, instruction, and support. Cornell Decl. Ex. F [PLF1035] (Magic judges are "the main envoys to the retail community"); Turner Decl. ¶ 16 [4:16-18]; Shaw Decl. ¶ 11 [3:24-26]; Stansfield Decl. ¶ 17 [4:22-24]; Golightly Decl. ¶ 15 [4:3-5]; Rutherford Decl. ¶ 8 [2:12-14]; Morrison Decl. ¶ 8 [2:15-17].  Wizards states that "Magic judges are perhaps best known as arbiters of tournament rules, but they are also passionate members of the Magic community who endeavor to ensure that events are fair and players learn the game." Cornell Decl. Ex. E [PLF1031].  Wizards generalizes that "[o]verall, the basic goal of a judge is to promote an environment that's fair, balanced and pleasant to the players."  *Id*. Ex. C [PLF1021].  As Wizards puts it, "even in small local tournaments [the Judge] may be working with other people, such as the Tournament Organizer and the Scorekeeper."  *Id.*

Wizards acknowledges that Judges "act as a region's points-of-contact and coordinator for the judge program" and assist Tournament Organizers, who operate Magic events on behalf of Wizards under Wizards direction, control and supervision,[5] in "finding judges for events, finding judging opportunities, and offering store owners advice on best practices for running events."  Cornell Decl. Ex. E [PLF1032].  As representatives of Wizards, "[t]he behavior of judges toward the Magic community affects [Judges'] ability to act as trusted experts at events" because they "represent the Judge Program and the Magic community."  *Id*. Ex. B [PLF1007, 1011].  Wizards encourages Tournament Organizers to reach out to Judges for assistance hosting Magic events by advising Tournament Organizers that Magic judges are their "connection to resources and players in your area" and that Judges are their link to "a community player network usually with other stores, professional organizers, and respected by the player community … with a good relationship they'll be able to help you with future events or questions you may have."  *Id*. Ex. I [PLF1094].  Unsurprisingly, Wizards

---

[5] Cornell Decl. Ex. P [PLF1124-1142].

describes local level Magic events and the Judge's critical role in organizing them in support of the Tournament Organizers as the "lifeblood of the game since the beginning." *Id*. Ex. H [PLF1089].

### H.   One Hundred Twenty-Six Individuals Have Already Opted Into This Collective Action and Many More Are Expected to Join Once Notice Is Sent

In addition, the four named Plaintiffs, one hundred twenty-six (126) opt-ins have filed valid consent to join forms to participate in this collective action.  ECF Nos 8, 11, 20 and 22.  Plaintiffs estimate that there are thousands of other potential opt-in Plaintiffs who stand to be notified pursuant to Plaintiffs' request and would likely want to participate.  Turner Decl. ¶ 17 [4:18-28]; Shaw Decl. ¶ 13 [4:3-13]; Golightly Decl. ¶ 16 [4:5-15]; Stansfield Decl. ¶ 18 [4:24-5:6]; Rutherford Decl. ¶ 9 [2:15-20].

### III.   ARGUMENT

#### A.   The FLSA Permits Collective Actions to Prohibit Unlawful Labor Practices

The FLSA requires, among other things, that employers pay covered employees at least a specified minimum wage for work performed and overtime pay for hours worked in excess of forty hours per week.  29 U.S.C. §§ 202, 207.[6]  The named Plaintiffs, and all other Judges working for Defendant, have been willfully and uniformly misclassified as volunteers and have thereby been denied minimum wage pay and overtime pay for hours worked in excess of forty per week.

In filing this motion, the named Plaintiffs refer this Court to the factual allegations set forth in the operative Complaint, as well as the declarations and exhibits submitted herewith and otherwise identified.  While the named Plaintiffs have not yet conducted class-certification discovery, the current record is more than sufficient to establish the propriety of sending notice to the putative opt-in plaintiffs.  *See, e.g.*, *Banks v. Robinson,* No. 2:11-cv-00441, 2011 WL 3274049, at *5 (D. Nev. July 28, 2011) ("At the first, or 'notice stage,' the court relies 'primarily on the pleadings and any affidavits submitted by the parties,' [to decide] 'whether the potential class should be given notice of the action.'" (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004))).

Where, as here, an employee alleges that his employer has failed to comply with the wage and

---

[6] *See also Bao Yi Yang v. Shanghai Gourmet, LLC*, 471 Fed. Appx. 784, 786 (9th Cir. 2012); *Solis v. Washington*, 656 F.3d 1079, 1083 (9th Cir. 2011).

hour mandates of the FLSA, it provides that "[a]n action to recover . . . may be maintained against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). The collective action authorized by the statute affords "plaintiffs the advantage of lower individual costs to vindicate rights by pooling their resources." *Hoffman-LaRoche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Its purpose is to ensure the enforcement of a statute enacted by Congress to combat "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being" by federally regulating wages and hours. 29 U.S.C. § 202.

Under the FLSA, to file a collective action, the plaintiffs must be "similarly situated," and they must opt-in to the lawsuit by filing a written consent with the court. 29 U.S.C. § 216(b).[7] It is imperative that analysis of the propriety of collective certification be guided by the broad remedial purposes of the FLSA at the forefront. *See Hoffmann-LaRoche, Inc.*, 493 U.S. at 173 (in authorizing court-facilitated notice to putative opt-in plaintiffs in a § 216 collective action, the Court observed that the "broad remedial goal of the statute should be enforced to the full extent of its terms").[8]

## B. In Determining Whether Plaintiffs Are Similarly Situated, the Courts in the Ninth Circuit Utilize a Two-Step Approach.

The FLSA does not define how similar the employees must be before they may proceed as a collective action. *See Hoffman-LaRoche Inc.*, 493 U.S. at 169. However, the majority of courts in this Circuit "have adopted a two-step approach for determining whether a class is similarly situated." *Harris*, 716 F. Supp. 2d at 837 (*quoting Murillo*, 266 F.R.D. at 470-71); *see also Zaborowski v. MHN Gov't Servs.*, No. C 12-05109, 2013 WL 1787154, at *1 (N.D. Cal. Apr. 25, 2013); *Adams v. Inter-Con Sec. Sys. Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007); *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d

---

[7] *See also Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000) ("Section 16(b) of FLSA authorizes an employee to bring an action on behalf of similarly situated employees, but requires that each employee opt-in to the suit by filing a consent to sue with the district court.") *Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 837 (N.D. Cal. 2010); *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 470 (E.D. Cal. 2010); *Vasquez v. Coast Valley Roofing, Inc.*, 670 F.Supp.2d 1114, 1123-24 (E.D. Cal. 2009).

[8] *See also Bureerong v. Uvawas*, 922 F. Supp. 1450, 1466 (C.D. Cal. 1996) (noting that "[b]ecause the FLSA is a remedial statute, it should be construed 'in order to further Congress' goal of providing broad federal employment protection'" (*quoting Abshire v. County of Kern*, 908 F.2d 483, 485 (9th Cir. 1990), *cert. denied*, 498 U.S. 1068 (1991))).

1067, 1082 (C.D. Cal. 2002).

In the first stage, the determination of whether the putative class members will be similarly situated "is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Murillo*, 266 F.R.D. at 470-471 (quoting *Mooney v. Aramco Servs.*, 54 F.3d 1207, 1214 (5th Cir. 1995)); *see also Helton v. Factor 5, Inc.*, No. C 10-04927, 2012 WL 2428219, at *4 (N.D. Cal. June 26, 2012); *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1128 (N.D. Cal. 2009). "The second-step usually occurs after discovery is complete, at which time the defendants may move to decertify the class." *Murillo*, 266 F.R.D. at 471.

As part of the first stage, courts have held that conditional certification only requires that plaintiffs make substantial allegations that the putative collective action members were subject to a single illegal policy, plan or decision. *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 527 F. Supp. 2d 1053, 1071 (N.D. Cal. 2007); *Harris*, 716 F. Supp. 2d at 837.. "The standard for certification at this [first] stage is a lenient one that typically results in certification." *Russell v. Wells Fargo & Co.,* No. C 07-3993 CW, 2008 WL 4104212, at *2 (N.D. Cal. Sept. 3, 2008) (citing *Wynn v. Nat'l Broad. Co. Inc.,* 234 F. Supp. 2d 1067, 1082 (C.D. Cal. 2002)). Courts, thus, consider any evidence available before them, including plaintiffs' declarations and any of defendant's policies or documents. *See Helton*, 2012 WL 2428219, at *4 (noting that "at the first tier" of the analysis, courts usually rely only on the pleadings and any declarations that have been submitted); *Shaia v. Harvest Mgmt. Sub LLC*, 306 F.R.D. 268, 275 (N.D. Cal. 2015) (applying the relaxed evidentiary rules to the first stage of 216(b) certification by granting conditional certification based on two declarations and uniform job descriptions to support claim of unpaid overtime); *Gilbert*, 2009 WL 424320, at *2 (granting conditional certification based on declarations from plaintiff and four other individuals); *Escobar v. Whiteside Constr. Corp.*, No. C 08-01120, 2008 WL 3915715, at *3-*5 (N.D. Cal. Aug. 21, 2008) (granting conditional certification based on declarations from three plaintiffs); *Adams*, 242 F.R.D. at 538; *Aguayo v. Oldenkamp Trucking*, No. 04-6279, 2005 WL 2436477, at *4 (E.D. Cal. Oct. 3, 2005) (disregarding hearsay and foundational challenges to declarations submitted in support of motion for conditional certification); *Leuthold*, 224 F.R.D. at 468-469 (granting conditional certification based on declarations from three proposed lead plaintiffs); *Ballaris v. Wacker Silttronic Corp.*, No. 00-1627, 2001 WL 1335809, at *2-*3 (D. Or. Aug. 24, 2001) (granting motion for conditional certification on basis of two declarations). "Many courts have indicated that a plaintiff must simply show that 'there is some factual basis beyond the mere averments in their complaint for the class allegations.'" *Wren v. RGIS Inventory Specialists*, 2007 WL 4532218, at *5 (N.D. Cal. Dec. 19, 2007). In fact, courts need

19

not consider evidence provided by defendants.  *Ramirez*, 941 F.Supp.2d at 1203.

**C.     This Case Should Be Conditionally Certified Because Plaintiffs Have Made Substantial Allegations to Justify Court-Facilitated Notice to the Putative Opt-ins**

Plaintiffs satisfy their minimal burden at this initial stage to show common allegations that they and the other Judges have not been paid all wages owed for work performed on behalf of Wizards as a result of its policies and practices of treating Judges as volunteers and not employees.  Even with minimal discovery, Plaintiffs' allegations and declarations demonstrate that Wizard's Judge program is coordinated and administered by Defendant and that Judges are Wizards' representatives to players, tournament operators, and others, and perform labor without which Wizards could not operate Magic events – the driving force behind its product sales.  Judges are highly regulated by Wizards in that they are subject to the same rigorous training and certification requirements set by Wizards, share similar job duties and responsibilities, abide by the same uniform policy, are subject to similar compensation and expense reimbursement policies, are subject to common policies regarding discipline and termination, are required to abide by the same code of conduct, and are under Wizards control even when not working.  Because Wizards' decision to misclassify judges as volunteers gives rise to the same FLSA violations for all putative opt-ins, this case is well-suited for conditional certification and court-facilitated notice.

**D.     Courts Have Conditionally Certified Similar Volunteer Cases**

Several courts have granted conditional certification of collective actions raising similar FLSA claims on behalf of volunteers.  *See, e.g., Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 628 (D. Colo. 2002) (granting conditional certification under Section 216(b) based on the plaintiffs' uniform allegations that they and the putative class members were employees as opposed to volunteers and received compensation below minimum wage or no compensation from defendants for the work, labor and services they performed); *Hallissey v. Am. Online, Inc.*, No. 99-CIV-3785 (KTD), 2008 WL 465112, at *2 (S.D.N.Y. Feb. 19, 2008) (granting Section 216(b) conditional certification because plaintiffs there were similarly situated with respect to their allegations that the FLSA had been violated by their misclassification as volunteers).

In *Reab v. Elec. Arts, Inc.*, the court granted conditional certification where the plaintiffs raised the common allegation that their classification as volunteers violated the FLSA.  214 F.R.D. at 629.

There, the plaintiffs and putative opt-ins consisted of players of the defendant's online multiplayer role playing game who performed customer-service oriented duties on behalf of the defendant, such as answering questions from other players of the game and otherwise assisting others in playing the game, but were uniformly treated as "volunteers."  *Id.* at 625-626.  The *Reab* court concluded that the plaintiffs were similarly situated because they raised substantial allegations that they were the victims of a single plan of the defendant – namely its plan to treat them as volunteers and its blanket refusal to pay them minimum wage for work performed.  *Id.* at 628-29.

Like in *Reab*, Wizards recruits Judges from among its customer base and seeks to use their unpaid labor to benefit its for-profit private business.  As victims of a single plan, Plaintiffs and the putative opt-ins a similarly situated to warrant conditional certification.  *See Hallissey*, 2008 WL 465112, at *2 ("the fundamental allegation found in Plaintiffs' declarations and pleadings that CLs were denied minimum and overtime wages because of their classification by AOL as 'volunteers' in the CL program is common to all of the CLs.").  Conditional certification is also consistent with the Department of Labor's long-standing enforcement position that a private employer's uniform misclassification of employees as volunteers constitutes a clear violation of the FLSA.  *See* DOL, elaws regarding Volunteers, http://webapps.dol.gov/elaws/whd/flsa/docs/volunteers.asp ("Under the FLSA, employees may not volunteer services to **for-profit** private sector employers").

### E.    Notice is Appropriate and Necessary to Protect Collective Members' Rights

The requirement that employees affirmatively consent to join a collective action under the FLSA makes the benefits of the statute's protections dependent upon "employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffman-LaRoche Inc.*, 493 U.S. at 170.[9]

Consistent with the Supreme Court's directives in *Hoffman-LaRoche Inc.*, Plaintiffs respectfully seek this Court's approval to send notice to the prospective FLSA opt-in plaintiffs.  Plaintiffs have prepared the attached proposed form of Notice to the putative class, which provides accurate information

---

[9] *See also Bonner v. SFO Shuttle Bus Co.*, 2013 WL 6139758, at *5 (N.D. Cal. Nov. 21, 2013) (approving plaintiffs' proposed notice in overtime case); *Gomez v. H & R Gunlund Ranches, Inc.*, No. CV F 10-1163, 2010 WL 5232973, *8 (E.D. Cal. 2010) (noting that "court authorization and facilitation of the notice process of such actions, under certain circumstances, is proper, 'if not necessary.'") (quoting *Hoffman-LaRoche Inc.*, 493 U.S. 165); *Lewis*, 669 F. Supp. 2d at 1128-1129 (same).

regarding the claims and the putative class members' rights to opt in pursuant to 29 U.S.C. § 216(b).[10] Cornell Decl. Ex. S.  The proposed Notice is clear with respect to the Court's approval and facilitation only of the notice of the claims, emphasizing that the Court takes no position on Plaintiffs' claims or Defendant's defenses.  Nor does the Notice purport to suggest that the Court is encouraging or advocating in favor of class members' joinder as plaintiffs in the action.  In addition, the proposed Notice provides an appropriate seventy-five (75) day opt-in period, which is presumptively standard in this Court,[11] constitutes the best notice practicable by providing notice by email and U.S. mail,[12] and promotes efficiency by authorizing the use of electronic signatures by the members of the Collective when opting-in.

### F.       Defendant Should be Compelled to Produce Contact Information for the Putative Opt-Ins

The district court in *Hoffman-LaRoche* correctly permitted the discovery of the names and addresses of the affected employees without limitation.  Indeed, the Supreme Court acknowledged that in order for employees to take advantage of the benefits under § 216(b), they need to receive "accurate and timely notice" regarding the pending collective action.  *Adams*, 242 F.R.D. at 539 (quoting *Hoffman-LaRoche*, 493 U.S. at 170).  Plaintiffs are entitled to specific discovery to determine the names and addresses of the putative class members.  *See, e.g.*, *Davis v. Soc. Serv. Coordinators, Inc.*, No. 1:10-CV-02372, 2012 WL 5838825, at *3 (E.D. Cal. Nov. 15, 2012); *Mitchell v. Acosta Sales, LLC*, 841 F. Supp. 2d 1105, 1120 (C.D. Cal. 2011).  Requiring Defendant to provide such information works no

---

[10] Also attached is a Proposed Consent form to be completed and returned by those individuals wishing to opt in.  The same shall be filed with the Court if the case is conditionally certified.

[11] *See, e.g., Sanchez v. Sephora USA, Inc*., 2012 WL 2945753, at *6 (N.D.Cal.2012) (Armstrong, J.), noting that "timeframes of sixty to ninety days appear to have become the presumptive standard in [the Northern] District.").

[12] *In re Apple IPhone 4 Prods. Liab. Litig*., 2012 U.S. Dist. LEXIS 113876, *5 (N.D. Cal. Aug. 10, 2012) (email notice to 15.7 million persons and publication); *In re Netflix Privacy Litig*., 2012, U.S. Dist. LEXIS 93284, *12-13 (N.D. Cal. Jul. 5, 2012); *Browning v. Yahoo! Inc*. 2006 WL 3826714, *8 (N.D. Cal. December 27, 2006); *Otey v. Crowdflower Inc*. 2013 WL 4552493, *5 (N.D. Cal. Aug 27, 2013) (approving notice by email and online postings, as opposed to notice via U.S. mail); *Lewis v. Wells Fargo* 669 F.Supp.2d 1124, 1128-29 (N.D. Cal. 2009) (requiring notice via email when "[t]he potential class members, technical support workers, are likely to be particularly comfortable communicating by email and thus this form of communication is just as, if not more, likely to effectuate notice than first class mail").

hardship, as it maintains a centralized computer database, which would allow it to run queries narrowly tailored to retrieve specific data (e.g., name, last known address, email address, and phone number for Judges who worked a Wizards sanctioned event in the United States during the last three years)[13] and to generate reports. Turner Decl. ¶ 18[5:1-3]; Shaw Decl. ¶ 14 [4:13-15]; Stansfield Decl. ¶ 19 [5:7-9]; Golightly Decl. ¶ 17 [4:16-18]. Therefore, should this Court grant the present Motion, Plaintiffs respectfully request that this Court order Defendant to produce the information within fourteen (14) days of any such order.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court conditionally certify the collective action pursuant to 29 U.S.C. § 216(b), authorize notice as proposed by Plaintiffs, and order Defendant to produce the putative opt-in list within fourteen (14) days of its order of conditional certification.

Dated:  June 14, 2017                              By:    /s/Matthew Righetti
                                                   Matthew Righetti, Esq.
                                                   RIGHETTI GLUGOSKI, PC
                                                   456 Montgomery St., Suite 1400
                                                   San Francisco, CA  94101
                                                   Telephone: (415) 983-0900
                                                   Facsimile:  (415) 397-9005

                                                   Attorneys for Plaintiffs, the Proposed Collective
                                                   and the Putative Classes

---

[13] The limitations period for a violation of the FLSA is generally two years, except when the employer's violation is proven to be willful, under which circumstances the statute of limitations is extended to three years.  *See* 29 U.S.C. § 255(a).   The courts, however, refrain from making determinations about willfulness at the conditional certification stage.  *See Smith v. Bimbo Bakeries USA, Inc.*, No. CV 12-1689, 2013 WL 4479294, *14 (C.D. Cal. Aug. 19, 2013) (holding that "[w]hile the Court agrees that plaintiffs have not yet shown willfulness, '[g]iven the lenient standard that Plaintiffs face at this stage and the difficulty of establishing, by affidavits, Defendant's willful behavior, the Court finds that . . . for the purpose of conditional certification, the three-year statute of limitations applie[s]" (quoting *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 484 (E.D. Cal. 2006))); *see also Gallagher v. Lackawanna County*, No. 3:CV-07-0912, 2008 WL 9375549, at *9 (M.D. Pa. May 30, 2008) ("Whether Defendant['s] violations of the FLSA were willful is an issue going to the merits of the case and not whether notice should be issued to potential claimants." (quoting *Resendiz-Ramirez v. P&H Forestry, LLC*, 515 F. Supp. 2d 937, 942-943 (W.D. Ark. 2007))); *Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 623 (D. Conn. 2007) (allegations in the complaint of willful violation justified notice based on three-year statute of limitations).