KARL R. LINDEGREN (SBN 125914)
klindegren@fisherphillips.com
SHAUN J. VOIGT (SBN 265721)
svoigt@fisherphillips.com
FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone (949) 851-2424
Facsimile (949) 851-0152

Attorneys for Defendant,
WIZARDS OF THE COAST LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM SHAW, PETER GOLIGHTLY, JUSTIN TURNER, and JOSHUA STANSFIELD, as individuals and on behalf of others similarly situated and the general public,<br><br>Plaintiffs,<br><br>vs.<br><br>WIZARDS OF THE COAST LLC,<br><br>Defendant. | Case No. 5:16-cv-01924-EJD<br><br>**DEFENDANT WIZARDS OF THE COAST LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND TO FACILITATE NOTICE UNDER 29 U.S.C. § 216(b)**<br><br>Date: November 9, 2017<br>Time: 9:00am<br>Courtroom: 4<br><br>Complaint Filed:   April 12, 2016<br>Trial Date:           None |

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION & SUMMARY OF THE ARGUMENT ............................................. 0

II.    STATEMENT OF FACTS ...................................................................................... 2

       A.    Overview of Magic: The Gathering and Organized Play ...................................... 2

       B.    Wizards Sanctions a Variety of Organized Play Events ....................................... 2

       C.    Sanctioned Event Results Are Submitted Via The Wizards Event Reporter ........ 3

       D.    Wizards Does Not Control The Judge Certification Process ................................. 3

       E.    Judges May Assist in the Running of Sanctioned or Unsanctioned Events ......... 4

       F.    Most Events Are Run By Stores And TOs That Agree to Comply With the
             Wizards Play Network Terms and Conditions ...................................................... 5

       G.    Wizards Runs Only A Limited Number of *Magic* Events Each Year, All At the
             Professional Rule Enforcement Level (REL) ....................................................... 7

       H.    The Majority of Organized Play Events Are Run By Members of the WPN and
             Premiere Tournament Organizers Throughout The United States ....................... 8

       I.    Store Owners and Tournament Organizers Vary Significantly In How They
             Engage and Compensate Judges ........................................................................... 8

       J.    As the Operative Complaint Makes Clear, Plaintiffs' FLSA Claim Is Limited To
             Alleged Unpaid Wages At *Magic* Events ........................................................... 9

       K.    Plaintiffs' Declaration and Deposition Testimony Demonstrates That They Are
             Not "Similarly Situated" To The Putative Class ................................................ 10

III.   ARGUMENT AND AUTHORITY .......................................................................... 11

       A.    Plaintiffs Must Establish That They Are "Similarly Situated" To All Members
             of the Class They Seek to Represent .................................................................. 11

       B.    The Court Should Consider Wizards' Declarations and Plaintiffs Shaw and
             Turner's Own Deposition Testimony In Ruling on the Motion ......................... 13

       C.    Plaintiffs Have Not Met Their Burden of Demonstrating That They Are
             Similarly Situated To the Putative Class ............................................................ 14

             1.    There Is No Evidence Of A Common National Policy or Plan By
                   Wizards That Violates The FLSA ........................................................... 14

             2.    Any Judge's Entitlement to Wages Requires An Individualized, Fact-
                   Specific Inquiry Unsuitable for Collective Action Treatment ............... 18

             3.    The Court Should Deny Plaintiffs' Motion Due To The Overbroad
                   Geographic Scope of the Proposed Collective of Judges ...................... 20

       D.    Fairness And Procedural Considerations Make A Collective Action Improper,
             Providing An Independent Reason To Deny Plaintiffs' Motion ......................... 21

FPDOCS 33017936.1

1

IV.   IF THIS COURT GRANTS PLAINTIFFS' MOTION, A REVISED 216(B) NOTICE
      SHOULD BE SENT BY WIZARDS OR A THIRD PARTY ADMINISTRATOR
2     WITH A 45 DAY OPT-IN PERIOD ................................................................................ 23

3     V.    CONCLUSION.................................................................................................................... 24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

1

2

**TABLE OF AUTHORITIES**

3

**Page(s)**

4

**Cases**

5

*Adams v. Inter-Con Sec. Systems, Inc.*,

6

    242 F.R.D. 530 (N.D. Cal. 2007)...................................................................14, 26

7

*Baden-Winterwood v. Life Time Fitness*,

    2006 U.S. Dist...........................................................................................26

8

*Basco v. Wal-Mart Stores, Inc.*,

9

    2004 U.S. Dist. LEXIS 12441 (E.D. La. July 2, 2004)................................19, 20

10

*Bernard v. Household Int., Inc.*,

11

    231 F.Supp.2d 433 (E.D. Va. 2002) ..............................................................22

12

*Board of Trustees v. Superior Court*,

    119 Cal.App.3d 516 (1981) .........................................................................25

13

*Brooks v. BellSouth Telecomms., Inc.*,

14

    164 F.R.D. 561 (N.D. Ala. 1995)..................................................................16

15

*Castle v. Wells Fargo Financial, Inc.*

16

    (N.D. Cal. Feb. 20, 2008) 2008 WL 495705 ..................................................20

17

*EEOC v. MCI Int'l, Inc.*,

    829 F.Supp.1438 (D. N.J. 1993)....................................................................23

18

*Ellerd v. County of Los Angeles*,

19

    2009 WL 982077 (C.D. Cal. April 9, 2009) ....................................................14

20

*Freeman v. Wal-Mart Stores, Inc.*,

21

    256 F.Supp.2d 941 (W.D. Ark. 2003)............................................................23

22

*Gromek v. Big Lots, Inc.*,

    2010 WL 5313792 (N.D. Ill. Dec. 17, 2010)..................................................23

23

*H&R Block Ltd. v. Houdsen*,

24

    186 F.R.D. 399 (E.D. Tex. 1999)..................................................................16

25

*Hinojos v. The Home Depot, Inc.*,

    2006 WL 3712944 (D. Nev. Dec. 1, 2006)....................................................21

26

27

*Hoffman-La Roche Inc. v. Sperling*,

    493 U.S. 165 (1989) (*Hoffman-La Roche*).....................................................14

28

FPDOCS 33017936.1

*Holt v, Rite Aid Corp.,*
    333 F.Supp.2d 1265 (M.D. Ala. 2004) .......................................................... 16, 20

*Lewis v. Wells Fargo & Co.,*
    669 F.Supp.2d 1124 (N.D. Cal. Oct. 26, 2009) .................................................... 25

*Lusardi v. Xerox Corp.,*
    118 F.R.D. 351 (D.N.J. 1987) .......................................................... 20, 21, 23

*Mark v. Gawker Media LLC,*
    2014 U.S. Dist. LEXIS 114011 (S.D.N.Y. Aug. 15, 2014) .................................... 26

*McQuay v. American Int'l Group Inc.,*
    2002 U.S. Dist. LEXIS 21307 (E.D. Ark. 2002), at *7-10 .................................... 22

*Palacious v. Boehringer Inglheim Pharm., Inc.,*
    2011 WL 6794438 (S.D. Fla. April 19, 2011) .................................................... 15

*Ray v. Motel 6 Operating Ltd.,*
    1996 U.S. Dist. LEXIS 22565 (D. Minn. Mar, 18, 1996) ...................................... 22

*Reich v. Homier Distributing Co.,*
    362 F.Supp.2d 1009 (N.D. Ind. 2005) .......................................................... 20

*Richie v. Blue Shield of California,*
    2014 WL 6982943 (N.D. Cal., Dec. 9, 2014) .................................................... 19

*Rivera v. Solstice Capital Group, Inc.,*
    2008 WL 4384123 (C.D. Cal. Aug. 21, 2008) .................................................... 16

*Saleen v. Waste Management, Inc.,*
    2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009) .................................... 14, 23

*Sheffield v. Orius Corp.,*
    211 F.R.D. 411 (D. Ir. 2002) .......................................................... 20

*Simmons v. T-Mobile USA, Inc.,*
    2007 WL 210008 (S.D. Tex. Jan. 24, 2007) .................................................... 20, 21

*Smith v. T-Mobile USA, Inc.,*
    2007 WL 2385131 (C.D. Cal. Aug. 15, 2007) .................................................... 14

*Trinh v. JP Morgan Chase & Co.,*
    2008 WL 1860161 (S.D. Cal. April 22, 2008) .................................................... 14, 23

*Tucker v. Labor Leasing, Inc.,*
    872 F.Supp. 941 (M.D. Fla. 1994) .......................................................... 22

*U.S. Dep't of Defense v. Fed. Labor Relations Auth.,*
    510 U.S. 487 (1994) .......................................................... 25

TABLE OF AUTHORITIES

FPDOCS 33017936.1

*Velasquez v. HSBC Finance Corp.*
   (N.D. Cal. 2010) 266 F.R.D. 424 ........................................................................ 20

*White v. Osmose, Inc.,*
   204 F.Supp. 2d 1309 (M.D. Ala. 2002) ............................................................... 16

*Williams v. Accredited Home Lenders, Inc.,*
   2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25, 2006) ...................................... 22

*Williams v. Accredited Home Lenders, Inc.,*
   2006 WL 2085312 ................................................................................................ 14

**Statutes**

20 U.S.C. §§ 206, 2017 ............................................................................................. 11

29 U.S.C. § 216(b) ....................................................................................... 13, 22, 23

## I.     INTRODUCTION & SUMMARY OF THE ARGUMENT

Defendant WIZARDS OF THE COAST LLC ("Wizards" or "Defendant") is a worldwide leader in the trading card game category, producing, *inter alia*, the highly popular "Magic: The Gathering®" trading card game and trading cards ("Magic").  Magic is a trading card game for ages 13+ set in a fantasy world of powerful wizards who have the ability to teleport between planes of existence.  Though the game is complex, the premise is simple: build a deck of 60 Magic cards and defeat your opponent by bringing his life total from 20 points to zero.

There are roughly 20 million *Magic* fans worldwide, with roughly 10 million residing in the United States.  While often enjoyed casually, these Magic enthusiasts can choose to play in events and tournaments across the U.S. and internationally, held in stores and other public venues.  Events run by stores and tournament organizers ("TOs") may feature one or more rules arbitrators (i.e. a "Judge"), although *Magic* game rules do not require a Judge and *Magic* tournament rules require a Judge in less than 2% of sanctioned events.  Judges, which comprise approximately 0.07% of the 10 million *Magic* fans in the United States since April 12, 2013, are generally engaged members of the Magic gaming community and active players of *Magic* who understand the game's nuanced rules, and elect to participate in *Magic* not only as players but also as judges (another form of participation)—and often as *both* in the same event.

The significant majority of *Magic* events in the United States are run by local game stores or independent TOs without any direct oversight by, or involvement from, Wizards.  As part of the terms and conditions of running a sanctioned event, stores and TOs contractually agree that they are solely responsible for all staffing decisions for the event, and similarly agree to comply with all laws applicable to staff that assist with the event, including compliance with all federal employment regulations.  Despite this fact, the only named defendant in this action is Wizards, which has never employed the plaintiffs or any of the party plaintiffs that have opted into the FLSA action.  Rather, Wizards contracts a limited number of Judges as independent contractors for discrete engagements, and does not engage individuals to provide services to stores or TOs.

By way of the instant motion, plaintiffs Justin Turner ("Turner"), Adam Shaw ("Shaw"), Peter Golightly ("Golightly"), And Joshua Stansfield ("Stansfield") (collectively "Plaintiffs"),

0

1    have requested that this Court conditionally certify a class of thousands of individuals that have

2    acted as a Judge at *any* sanctioned *Magic* event, *anywhere* in the United States, *at any time* from

3    April 12, 2013 to the present.  As broadly defined by Plaintiffs, this putative class consists of

4    more than 7,000 individuals that have participated as a judge at one of the more than *1.325*

5    *million* sanctioned *Magic* events that have taken place in the United States since April 12, 2013.

6         Given the nature of Plaintiffs' theory of liability and the facts in this case as revealed in

7    discovery thus far, the putative class consists of, among others: i) individuals that have judged

8    one of the limited number of *Magic* events run by Wizards in the United States, all of whom

9    *enter into written independent contractor agreements and are compensated by Wizards* for their

10   services; ii) store owners that have been certified as Judges and participate as judges in sanctioned

11   events *in their own stores*; iii) *employees* of retail locations that participate as Judges *at in-store*

12   *events as part of their regular employment* with the store; iv) individuals playing in *Magic* events

13   who are also designated as a Judge for that event; v) employees of premiere TOs that judge

14   sanctioned events as part of their employment with the tournament organizer running the event;

15   vi) individuals that enter into limited employment or independent contractor agreements with

16   stores or TOs to participate as judges in specific sanctioned *Magic* events and receive

17   compensation as a result of arms-length negotiation the store or TO; vii) individuals that are

18   judging at a store for a friend, as Plaintiff Shaw testified, without an expectation of compensation;

19   and viii) individuals that, according to Plaintiffs unsupported declarations, have judged *Magic*

20   events without receiving the compensation they believe they are entitled under the FLSA; and

21   ix) individuals who are not certified judges but are listed as a judge for purposes of reporting the

22   results of non-competitive but sanctioned *Magic* events.

23        It is Plaintiffs burden to demonstrate that they are similarly situated to this entire group

24   of individuals they seek to represent—i.e. that they and the putative class were the victims of a

25   *single* decision, policy, or plan that violates the FLSA.  Here, the evidence overwhelmingly

26   demonstrates that Plaintiffs are not even similarly situated to each other.  This is not surprising,

27   considering that the putative class consists of more than 3,850 individuals, judging at events for

28   more than 4,490 stores and TOs throughout the United States, under a number of unique

1

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

FPDOCS 33017936.1

1   employment and/or independent contractor arrangements, with varying compensation practices
2   that are all outside of the direction or control of Wizards.  Six cookie-cutter declarations from
3   Plaintiffs and two of the 126 opt-in Plaintiffs fall far short of Plaintiffs' burden, even at the initial
4   stage of the conditional certification proceedings.  The Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    <u>Overview of Magic: The Gathering and Organized Play</u>

Wizards produces the highly popular *Magic* trading card game and trading cards. Although *Magic* is most often played casually at home or with friends in a retail hobby store (often referred to as "kitchen table" play), *Magic* players can elect to play in organized events and tournaments of varying levels.  (Bazakas Decl., at ¶ 6).  Tournaments and events can be "sanctioned" or "unsanctioned" by Wizards, and are hosted throughout the world in stores, convention centers, and other public venues on a near daily basis.  These *Magic* events are commonly referred to as organized play ("Organized Play").  (Bazakas Decl., at ¶¶ 6-9).

Organized Play provides a wide range of options for Magic players of all skill levels to come together and play and enjoy Magic in an organized way, whether it is small local gatherings of players who just want to play against others who love the game, or large-scale multi-day tournaments with players of all skill levels, including those who take their passion for Magic to the competitive stage.  (Bergot Decl., at ¶ 8).  Organized Play *Magic* events are run at different rule enforcement levels ("REL"), which refers to the level of application of the *Magic* rules. There are three REL levels: Regular, Competitive and Professional.  (*Id.*, at ¶ 9).

### B.    <u>Wizards Sanctions a Variety of Organized Play Events</u>

Wizards sanctions various types of branded in-store *Magic* events, including by way of example: Friday Night Magic; Prereleases; Draft Weekend; Magic League; and Preliminary Pro Tour Qualifier, among others.  (Bazakas Decl., at ¶ 7).  In addition, stores can host a variety of non-branded events that are also considered "sanctioned" by Wizards.  (*Id.*).

Authorized premiere TOs can host large-scale *Magic* events and tournaments that are also sanctioned by Wizards.  (Bazakas Decl., at ¶ 7).  While Plaintiffs seek to attach great import to the term "sanctioned"—and indeed limit the putative class to individuals that have Judged

1   sanctioned *Magic* events—that designation is not dispositive of any issue in this case.  Rather, a

2   *Magic* event is considered "sanctioned" by Wizards merely if it is (a) scheduled by a member of

3   the Wizards Play Network (such as a retail store owner) or an authorized tournament organizer;

4   and (b) the event results are submitted to Wizards.  (*Id.*, at ¶ 9; Shaw Depo., at 43:4-25).

5       **C.**    **Sanctioned Event Results Are Submitted Via The Wizards Event Reporter**

6          Results from sanctioned events are most typically submitted to Wizards via the Wizards

7   Event Reporter ("WER"), which is a downloadable program used by tournament organizers and

8   Wizard Play Network retail locations to schedule, run, and report Magic events.  (Bazakas Decl.,

9   at ¶ 10; Bergot Decl., at ¶ 15).  The event results that are uploaded to Wizards via the WER

10  include the DCI number of the individuals that participate in the event, which enables players to

11  accumulate Planeswalker Points—a system that tracks gameplay and rewards players for

12  participating in sanctioned *Magic* events.  (Bazakas Decl., at ¶ 10).

13         In addition, the DCI number of the TO and/or retail store running each event is submitted

14  via the WER.  (*Id.*, at ¶ 11).  Finally, the store owner or TO running the event may elect to submit

15  the DCI number for some or all of the individuals it engages as Judges, regardless of whether the

16  Judge is the store owner, an employee of the store judging as part of his or her normal job duties,

17  a player that is also judging the event in a dual capacity, or anyone else that participates in the

18  event as a Judge.  (*Id.*, at ¶ 11; Bergot Decl., at ¶ 21; Shaw Depo., at 61:12-62:16, 87:24-88:21,

19  90:2-91:5, 196:5-9, 262:16-263:25).  Thus, an individual's DCI number may be submitted via

20  the WER in both the player and judge categories for the same event.  (Bazakas Decl., at ¶ 11).  A

21  number of individuals designated as judges in WER are not certified Judges, but rather are

22  individuals designated as "judge" by WER simply because they uploaded gameplay results.  (*Id*).

23      **D.**    **Wizards Does Not Control The Judge Certification Process**

24         Organized Play events may feature one or more individuals certified as judges.  (Bergot

25  Decl., at ¶ 10).  Judges tend to be highly engaged members of the *Magic* gaming community and

26  active players of *Magic* who understand *Magic's* nuanced rules, and elect to participate in their

27  hobby not only as players but also as judges. (*Id.*)   Currently, there are three levels of certified

28  Judges: L1, L2, and L3. (Bergot Decl., at ¶ 11).  Prior to approximately April of 2016, there were

1  five levels of Judges: L1 through L5. (*Id.*)  Wizards did not propose or have a role in the change

2  in certification levels for Judges. (*Id.*.).  Rather, the Judge community developed and

3  implemented that change independent from Wizards. (*Id.*)

4      Under both the current and prior system, each Judge level has had a set of criteria for

5  advancement to that level and for maintaining the level. (Bergot Decl., at ¶ 12).  Notably, it is

6  the Judge community, *and not Wizards*, that sets the criteria for selection and advancement to

7  each of the Judge levels. (Bergot Decl., at ¶ 13).  Moreover, it is the Judges themselves that

8  initially certify individuals as L1 Judges. (*Id.*)  It is also the Judges that promote individuals

9  among the varying Judge levels. (*Id.*)  Judges also administer and govern the Judge community.

10  (Bergot Decl., at ¶¶ 13, 30-38).  In fact, contrary to Plaintiffs' suggestion, it was Judges (not

11  Wizards) that developed the Judge Code of Conduct that is posted on magicjudges.org, a third-

12  party website.  (Turner Depo., at 77:17-79:2, 242:12-16.)  Aside from hosting the practice tests,

13  Wizards is not involved in the Judge certification process.  (Bergot Decl., at ¶ 13).

14      When an individual is certified as a Magic judge by the judge community, the individual's

15  name and judge level is reported to Wizards and input into a Wizards' database, with minimal

16  additional information.  (Bazakas Decl., at ¶ 19).  Wizards does not, for example, maintain the

17  street address or social security number of Judges in its database.  (*Id.*)  Since April 12, 2013,

18  more than 4,915 individuals have been reported to Wizards as meeting the criteria set by the

19  judge community to be certified as judges.  (Bazakas Decl., at ¶ 20).

20      **E.    Judges May Assist in the Running of Sanctioned or Unsanctioned Events**

21      Most sanctioned events in the United States, such as Friday Night Magic, Prereleases,

22  and all casual events, ***do not require a Judge***.  (Bazakas Decl., at ¶¶ 8, 21-22, Exh. 3; Shaw

23  Depo., at 91:1-5).  In fact, more than 98% of all Organized Play events do ***not*** require a Judge.

24  (*Id.*)  Nevertheless, retail stores and TOs can utilize a Judge (which can be a store owner or

25  employee of the store or TO) for such events at their own discretion.  (Bergot Decl., at ¶ 21).

26  Indeed, it is common for retail store owners and TOs, as well as direct-hire employees of retail

27  stores and TOs, to be certified as Judges and serve as Judges in *Magic* events run by the respective

28  stores and/or TOs. (Bergot Decl., at ¶ 10).  Moreover, an individual can act as both a player and

1  a judge in such events.   (Bazakas Decl., at ¶ 11; Bergot Decl., at ¶ 10; Shaw Depo., at 90:12-

2  91:5).  Thus, an individual can and often does play in the event he or she is judging.  (*Id.*)

3       Again, the vast majority of *Magic* events do not require a certified Judge.  Rather, only

4  the retail stores or TOs voluntarily electing to run a handful of specific competitive level REL

5  *Magic* events agree to utilize a certified Judge as a condition of the agreement with Wizards for

6  hosting the specific sanctioned event. (Bergot Decl., at ¶ 22).  Thus, a certified judge is required,

7  as an agreed upon condition *between Wizards and the third-party store or TO*, for only a tiny

8  fraction of all sanctioned Magic events.  (Bazakas Decl., at ¶¶ 8, 21-22, Exh. 3).  The number of

9  sanctioned *Magic* events that required a Judge since April 12, 2013 totals less than 1.75% of the

10 more than 1.325 million sanctioned *Magic* events run during that period.  (*Id*).

11      Even where a certified Judge is required, the store or tournament organizer running these

12 specific   competitive   level   REL   sanctioned   event   is   and   has   been   responsible   for

13 selecting/engaging the Judge(s), and complying with applicable laws with respect to the event.

14 (Bergot Decl., at ¶ 23; Bazakas Decl., at ¶ 13-16; see also Turner Depo., at 184:22-187:4).  The

15 only exception has been Grand Prix events held on or before December 31, 2016, where the

16 contract between Wizards and the relevant TOs delegated the selection and engagement of the

17 head Judge(s) to Wizards.  For all Grand Prix events held before December 31, 2016, Wizards

18 entered into written independent contractor agreements and financially compensated the head

19 Judge(s) that it selected. (Bergot Decl., at ¶ 24.)  For Grand Prix events held on or after January

20 1, 2017, the TO is responsible for the selection of a head judge and all other aspects pertaining

21 to the Judges and staff it may elect to utilize for the event.  (Bergot Decl., at ¶ 24.)

22      **F.**     **Most Events Are Run By Stores And TOs That Agree to Comply With the**

23              **Wizards Play Network Terms and Conditions**

24      The Wizards Play Network ("WPN") is a promotional program for core hobby game

25 stores that elect to run in-store events and/or tournaments from the Wizards brand family.  This

26 includes, among others, Dungeons & Dragons™ ("D&D") and *Magic*.  (Bazakas Decl., at ¶ 5).

27      While any store or individual can host a branded event such as Friday Night Magic, stores

28 that are members of the WPN that sign up to host such an event are eligible to post the event date

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
FPDOCS 33017936.1

1  and location on the event locater page of Wizards' website (http://locator.wizards.com/).

2  (Bazakas Decl., at ¶ 12).  WPN members can also receive promotional items such as posters,

3  game accessories, and *Magic* cards.  (*Id.*)  As Plaintiffs' concede in their declarations, WPN

4  members are prohibited from selling the provided materials or using promotional items for any

5  purpose other than providing them to individuals that participate in an event.  (Turner Decl., at ¶

6  28; Bazakas Decl., at ¶ 12; see also Turner Depo., at 95:24-96:24).

7      In the United States, any hobby game store seeking to join the WPN is required to

8  complete an application process.  Once the application process is completed and approved,

9  eligible stores are invited to join the WPN.  As a condition of joining the WPN, an authorized

10  agent and/or representative of the retail store is required to agree to the Wizards Play Network

11  Terms and Conditions ("WPN Terms & Conditions").  (Bazakas Decl., at ¶¶ 13-15, Exhs. 1-2).

12  The current WPN Terms & Conditions set forth the WPN member's obligations, which include

13  sole responsibility for staffing events.  To that end, Section 5(b) provides:

14      <u>Responsibility for Staff</u>. You agree that all people and companies you employ,
utilize or otherwise recruit to work in your Retail Store or to assist with
15  conducting Events (collectively "Staff") will comply with these WPN Terms and
all applicable laws, ordinances, regulations and other governmental requirements.
16  You likewise agree to comply with all federal, state, and local laws related to any
employment relationship that may exist between you and your Staff consistent
17  with Section 6. You further agree that nothing in these WPN Terms creates an
employment relationship between Wizards and your Staff. You remain solely
18  liable for all Staff activity under your WPN Membership.

19

20  (Bazakas Decl., at ¶¶ 13-15, Exh 1).

21      Section 6 further provides: "**Compliance with Laws**. As a WPN Member, you agree to

22  comply with all applicable laws, ordinances, regulations and other governmental requirements

23  applicable to you, your Retail Store, your Staff and your Events including, but not limited to, …

24  employment, workers compensation coverage, tax, wage and hour…" (*Id.*).  The prior version

25  of the WPN Terms & Conditions included similar provisions regarding event staffing and

26  compliance with applicable laws by stores and TOs. (*Id.*, Ex. 2.)

27      Thus, stores participating in the WPN agree to maintain exclusive responsibility for in-

28  store staff and individuals assisting in the running of *Magic* events that are sanctioned through

6

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

1   the WPN.  (Bazakas Decl., at ¶¶ 13-15, Exhs. 1-2).   Participating stores also agree to comply

2   with all laws, ordinances, regulations and other governmental requirements applicable to in-store

3   staff and individuals assisting with the events.   Similar to members of the WPN, premiere

4   tournament organizers running sanctioned *Magic* events contractually agree to comply with all

5   applicable laws, ordinances, regulations and other governmental requirements.  (Bazakas Decl.,

6   at ¶ 16.)  Premiere TOs are also solely responsible for staffing decisions related to individuals

7   they engage and/or hire to assist in running the sanctioned Magic event(s).   (*Id.*)

8          G.    **Wizards Runs Only A Limited Number of *Magic* Events Each Year, All At**

9               **the Professional Rule Enforcement Level (REL)**

10          Nearly all Organized Play events are run by local retail stores and independent TOs

11   without oversight or involvement by Wizards. (Bergot Decl., at ¶ 17).  The only exception is the

12   Magic Online Championship, the Magic Pro Tour, the World Magic Cup, and the Magic World

13   Championship, which are run directly by Wizards.  (Bergot Decl., at ¶ 17).

14          For the Magic Pro Tour, the World Magic Cup, and the Magic World Championship,

15   Wizards runs all aspects of the tournament. (Bergot Decl., at ¶ 19).  This includes, among other

16   things, engaging individuals as Judges from the U.S. and across the globe to act as rules

17   arbitrators, or Judges. Wizards enters into written independent contractor agreements and

18   financially compensates the Judges that it engages to assist with these events. The contractual

19   agreements cover the scope and terms of the relationship between Wizards and the Judges. (*Id.*)

20          Aside from the limited number of events discussed above, Wizards' involvement in

21   sanctioned *Magic* events is generally limited to providing promotional items, accessories, and

22   cards—the specifics of which have changed over time and depend on the event and other factors.

23   (Bergot Decl., at ¶ 20).   The promotional items can be used and distributed by the

24   store/tournament organizer that is holding the sanctioned events. (Bergot Decl., at ¶ 20; Bazakas

25   Decl., at ¶ 12).  For such events, it is the store/tournament organizer that determines, among other

26   things, whether to run an event, the date and location of the event, staffing, the number of entrants

27   permitted, the length of the event including any breaks in game play, and whether to charge

28   players an entry fee and, if so, the price.  (Bergot Decl., at ¶ 20).

H.     **The Majority of Organized Play Events Are Run By Members of the WPN and Premiere Tournament Organizers Throughout The United States**

As indicated, most Organized Play events are run by third-party TOs and independently owned and operated retail stores. Since April 12, 2013, more than 4,490 retail stores in the United States have been registered as members of the WPN, and are therefore able to run sanctioned events. (Bazakas Decl., at ¶ 17.) This includes retail stores throughout the US, and indeed, in all 50 states. Collectively, those stores have ran more than 1,325,000 sanctioned Magic events during this time period. Again, less than 1.75% of those events have required a certified Judge. (*Id.*) Outside of stores, authorized TOs have also run numerous sanctioned *Magic* tournaments and events throughout the United States since April 12, 2013. In fact, more than 10 separate premiere TOs have run approximately 21,943 sanctioned *Magic* events during this time period, throughout the United States. (Bazakas Decl., at ¶ 18.)

I.     **Store Owners and Tournament Organizers Vary Significantly In How They Engage and Compensate Judges**

There are significant differences among the various *Magic* event types and hundreds of thousands of events held throughout the United States each year. (Bergot Decl., at ¶ 26; Bazakas, at ¶¶ 6-7, 16-18). Events can range from a single night event involving a few players at a local game store such as Friday Night Magic, to a multi-day Grand Prix involving thousands of players at a large public venue. (*Id.*) Events such as a Grand Prix also involve various side events (i.e. smaller tournaments of varying types in addition to the main event). For each of those events, there are substantial variations in how the events are organized, managed, and run, including the selection and utilization of Judges—and any resulting compensation provided to them. (*Id.*)

There is also substantial variation in the relationship between stores and TOs, on the one hand, and the Judges that may participate in their respective events. The individual participating as a Judge in an event can, for example, be the store owner, an hourly paid employee of the store owner that acts as Judge while overseeing the retail operations and event, a player that happens to be a Judge and performs both roles while playing in the event, an employee of a TO that serves as part of the core team in the operations of the event, and an individual that is engaged by the

1  store or tournament organizer for the sole purpose of acting as a Judge in the event, just to name

2  a few examples.  (Bergot Decl., at ¶ 27; see also, e.g., Turner Depo., at 35:15-36:9, 44:12-14,

3  62:15-63:11, 69:10-20, 182:17-24, 183:13-20, 184:14-21, 291:13-25).

4       Since approximately 2012, a third-party website hosted at apps.magicjudges.org and

5  commonly referred to as "Judge Apps," has been used by *Magic* TOs as the system for

6  selecting/engaging Judges for large *Magic* tournaments and other events. (Bergot Decl., at ¶ 28;

7  Bazakas Decl., at ¶ 25).  TOs can publish an event they are running on Judge Apps, including

8  event details and what the TO is offering for compensation and/or travel expenses, and

9  individuals that want to be considered to Judge the event can then contact the TO via Judge Apps

10  and express interest. (*Id.*; Shaw Depo., at 31:17-33:25, 104:3-105:2; Turner Depo., at 162:11-

11  21).  Wizards does not direct or require individual Judges to apply for specific events.  (*Id.*)

12  Wizards does not control, own, financially support or otherwise direct Judge Apps.  (Bergot

13  Decl., at ¶ 29).  Judge Apps is owned and run by Judges and hosted on a third-party website,

14  magicjudges.org.  (*Id.*)  And in fact, Wizards uses Judge Apps to engage independent contractors

15  for its limited number of events in the same manner in which stores or TOs may engage judges

16  for their respective events.  (Bazakas Decl., at 25).

17       **J.       As the Operative Complaint Makes Clear, Plaintiffs' FLSA Claim Is Limited**

18            **To Alleged Unpaid Wages At *Magic* Events**

19       Plaintiffs initiated this action on April 12, 2016 with the filing of a civil complaint against

20  Wizards.   Thereafter, on December 5, 2016, Plaintiffs' filed a First Amended Complaint

21  ("Complaint").  (Dkt. No. 33).  Plaintiffs' now operative Complaint asserts a single cause of

22  action under the Fair Labor Standards Act ("FLSA"), alleging that Wizards "failed to pay

23  [Plaintiffs and the putative class] … any compensation for the work and labor they performed

24  for the Defendant as employees of the Defendant at *Magic* Events…" (Dkt No. 33, at ¶¶ 29-30).

25  As a result, Plaintiffs contend that Wizards is liable for an unknown amount of unpaid minimum

26  wage and overtime pursuant to 20 U.S.C. §§ 206, 2017.  (*Id.* at ¶ 31).

27       Plaintiffs' Complaint makes clear that their FLSA claim is limited to allegedly unpaid

28  minimum wage and overtime "for the work and labor [Plaintiffs' and the putative class]

9

1 performed … ***at Magic Events***.  (Dkt No. 33, at ¶¶ 29-30 [emphasis]; see also *id.* at 11, 13-16

2 [defining and discussing "Events"].).   Indeed, Plaintiffs define the nationwide class to include

3 only those "persons domiciled in the United States who worked as Judges at a ["regular,"

4 "competitive," or "professional"] level [*Magic*] Event in the United States during the period

5 commencing three years from the filing of this action through the entry of final judgment." (Dkt

6 No. 33, at ¶ 19).  Here, Plaintiffs seek to certify a collective action "on behalf of all individuals

7 who ***participated as Magic: the Gathering judges at events sanctioned by [Wizards]*** from April

8 12, 2013 through the resolution of the case."  (Dkt No. 46, at p. 2:5-7).

9       Despite the fact that Plaintiffs' FLSA claim is limited by the Complaint to work that

10 Plaintiffs and the putative class allegedly performed for Wizards at *Magic* "Events," their cookie-

11 cutter declarations purport to describe various work-related activities performed by Plaintiffs and

12 the putative class outside of such Events (i.e. obtaining and maintaining a Judge certification,

13 "mentoring" other Judges in internet chat rooms, etc.).    Given the limited scope of Plaintiffs'

14 FLSA claim, such "evidence" is entirely irrelevant to this Motion, and should be disregarded.

15     **K.**    **Plaintiffs' Declaration and Deposition Testimony Demonstrates That They**

16         **Are Not "Similarly Situated" To The Putative Class**

17       The six declarations submitted in support of conditional certification uniformly—and

18 with nearly identical language—make broad pronouncements unsupported by anything beyond

19 generalized statements and speculation, which they seek to extrapolate across the nationwide

20 putative class.   The declarations reference purported acts or statements by "Wizards"—a

21 corporation—without attempting to disclose the identity of the Wizards employee or authorized

22 agent that allegedly made the referenced statements or engaged in the purported acts.

23       Plaintiffs' declarations are also directly contradicted by Plaintiffs Turner and Shaw's own

24 deposition testimony.  For example, Plaintiff Golightly states: "From speaking with other Magic

25 judges, I have learned that Wizards has never provided any Magic judge with wages…"

26 (Golightly Decl., ¶ 26; see also Shaw Decl., ¶ 22; Stansfield Decl., ¶ 22).   At his deposition,

27 however, Plaintiff Turner confirmed that he was aware Wizards had compensated L4 judges for

28 head judging events. (Turner Depo., at 151:22-152:1).  Plaintiffs' Turner and Shaw also testified

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

1   that they had been compensated by Wizards for judging Wizards-run events.  (See, e.g., Turner

2   Depo., at 123:12-125:21, 126:5-23, 133:10-22; Shaw Depo, at 222:16-225:17.)   Contrary to

3   Plaintiff Stansfield's assertion, he too has been compensated by Wizards for at least three

4   sanctioned *Magic* events since April 12, 2013.  (Bazakas Decl., at ¶ 24).

5        Plaintiffs also declare in their declarations that they "have always been required to cover

6   [their] own work-related expenses, including travel and accommodation, in connection with

7   [their] work as a Magic judge."  (Shaw Decl., at ¶ 24; Turner Decl., ¶ 25).   However, Turner

8   testified that Wizards paid for his travel and hotel on at least one occasion.  (Turner Depo., at

9   133:10-22).   Turner explained that, to his understanding, the contracts he entered into with

10  Wizards "were supposed to be inclusive of [travel]."  (*Id.*, at 133:23-134:17).  Contradicting his

11  declaration, Turner testified regarding an event he attended, where the TO covered the cost of

12  his hotel.  (Turner Depo., at 66:17-24).  Shaw also testified to having a flight covered by a TO

13  (Shaw Depo., at 30:17-31:1), and had no recollection or records of expenses incurred at other

14  events (*id.*, at 114:21-25, 117:6-9).  As another example, Plaintiffs state: "As a Magic judge I

15  was told by head judges that they received instructions directly from Wizards and implemented

16  Wizards' scheduling and hiring decisions among the Magic judges in my group, among other

17  things."  (Turner Decl., ¶ 20).  On this same topic, however, Turner's deposition testimony is in

18  sharp contrast.  (Turner Depo., at 184:22-187:4 [describing his role as "head judge" at events].).

19       Simply put, Plaintiffs "evidence" consisting of six nearly identical declarations is not

20  sufficient to certify the broad nationwide class at issue in this Motion, particularly when viewed

21  against the sworn deposition testimony of Shaw and Turner.  It is abundantly clear that Plaintiffs

22  are not "similarly situated" to the putative class, and their Motion should be denied.

23  **III.     ARGUMENT AND AUTHORITY**

24       **A.     Plaintiffs Must Establish That They Are "Similarly Situated" To All**

25              **Members of the Class They Seek to Represent**

26       The FLSA permits a plaintiff to maintain an action on "behalf of himself … and other

27  employees similarly situated."  29 U.S.C. § 216(b).  In appropriate circumstances, Courts have

28  broad discretion to regulate the notice, if any, sent to "similarly situated" potential plaintiffs.

1   *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 168-70 (1989) (*Hoffman-La Roche*); *Smith v.*

2   *T-Mobile USA, Inc.*, 2007 WL 2385131, at *3 (C.D. Cal. Aug. 15, 2007).

3       The FLSA does not define "similarly situated," but the Supreme Court indicated in

4   *Hoffman-La Roche* that a proper collective action encourages judicial efficiency by addressing

5   in a single proceeding claims of multiple plaintiffs who share "common issues of law and fact,

6   arising from the same alleged [prohibited] activity." *Id.* at 170.   A plaintiff seeking conditional

7   certification must establish that putative class members "were together the victims of a single

8   decision, policy, or plan" that violates the FLSA.   *Adams v. Inter-Con Sec. Systems, Inc.*, 242

9   F.R.D. 530 (N.D. Cal. 2007) (certification requires that "plaintiffs make substantial allegations

10  that the putative class members were subject to a single illegal policy, plan or decision").

11      Contrary to Plaintiffs' suggestion, court-facilitated notice is not mandatory or automatic.

12  This is because conditional certification imposes significant costs and burdens on both the parties

13  and the Court, including "the expense of sending out notice to the putative collective members,

14  the substantial widening of discovery, and the burden on the courts of administrating the

15  thousands of claims brought … nationwide." *Saleen v. Waste Management, Inc.*, 2009 U.S. Dist.

16  LEXIS 49891, at *29 (D. Minn. June 15, 2009).   While the Court's analysis is less rigorous at

17  the notice stage, unsupported assertions of FLSA violations are not sufficient to meet Plaintiffs'

18  burden. *Ellerd v. County of Los Angeles,* 2009 WL 982077, *3 (C.D. Cal. April 9, 2009) (quoting

19  *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 990 (C.D. Cal. 2006)).

20      In addition, during the first stage analysis, courts may examine the extent to which

21  Plaintiffs will rely on common evidence and the level of individualized inquiries required when

22  deciding whether to certify a collective action. *Trinh v. JP Morgan Chase & Co.*, 2008 WL

23  1860161, at *5 (S.D. Cal. April 22, 2008).   Courts can also consider the burdens imposed on all

24  parties in ruling on conditional certification where, as here, there are a significant number of

25  putative class members that were engaged by third parties in the performance of the challenged

26  activity—i.e. participating as judges in sanctioned events. *Williams v. Accredited Home Lenders,*

27  *Inc.*, 2006 WL 2085312, at *4 & fn.4 (N, D. Ga July 25, 2006 (similarity requirements for

28  conditional certification must be applied with "rigor" in large collective action cases).

**B.**  **The Court Should Consider Wizards' Declarations and Plaintiffs Shaw and Turner's Own Deposition Testimony In Ruling on the Motion**

In support of conditional certification of this vast, diverse, nationwide group of putative class members, Plaintiffs rely solely on their own declarations and the declarations from two of the 126 opt-in Plaintiffs, for a total of six declarations. These declarations do nothing to establish the factual nexus required for conditional certification of the putative class at issue in this case. For one, the declarations are nearly identical, which suggests they are based on a lawyer's theories rather than personal knowledge of the declarant. *Palacious v. Boehringer Inglheim Pharm., Inc.,* 2011 WL 6794438, at *5 (S.D. Fla. April 19, 2011) ("Plaintiff attaches three almost identical, cut-and-paste declarations … The Court strongly disapproves of the use of boilerplate attorney-drafted declarations"). Moreover, Plaintiffs Turner and Shaw's broad proclamation of knowledge regarding other putative class members in their attorney-drafted declarations is in sharp contrast to their own deposition testimony, where they expressed limited knowledge regarding the central issue in their FLSA claim—whether Judges performed compensable work by judging *Magic* events and if so, were paid at least minimum wage and overtime (if applicable).

For example, Turner's declaration states: "Based on my years of experience as a Magic judge, I know what Magic Judges do, how much time they spend performing those duties, and how Wizards controls or regulates those duties without properly paying judges for their work performed." (Turner Decl., at ¶ 12). During his deposition, however, Turner could not answer basic questions regarding the Judge activity of his co-plaintiff and friend, Adam Shaw. (Turner Depo., at 59:14-60:3). Turner also testified that he lacked knowledge regarding whether Judges running events that he participated in as a player were being compensated. (Turner Depo., at 40:23-43:14). Perhaps most telling, Turner has virtually no knowledge regarding the hours, compensation, or other aspects of the arrangements that his own fiancée, who lives with him, has made in Judging *Magic* events. (Turner Depo., at 74:3-76:1[1]). Shaw's memory fared no better.

---

[1] Turner testified at deposition: "Q. Katie Temple; is that your fiancé? A. Yes, sir. Q. How much did she make in 2016 judging? A. Unaware. Q. Did she judge? A. She did. Q. Where? A. Let's see. I believe she did – actually, no, she didn't in 2016. She didn't judge any big tournaments. She judged a couple of local things for stores. I am unaware of what compensation she received.

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
FPDOCS 33017936.1

1  (See, e.g., Shaw Depo., at 33:23-25 ["I have no personal knowledge of whether or not people

2  were paid or how they were – they're paid"]; *id.*, at 94:3-17).

3       In light of the divergence between the attorney-drafted declarations and deposition

4  testimony, it is no surprise that Plaintiffs suggest that the Court ignore any evidence submitted

5  by Wizards.  (Motion, at 19:28-20:1).  The Court should not, however, disregard evidence and

6  facts outside of Plaintiffs' six cookie-cutter declarations—including but not limited to Plaintiffs

7  own deposition testimony—particularly when they are not going to change with further

8  discovery.  See *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1274 (M.D. Ala. 2004) (rejecting

9  plaintiff's argument that the court should ignore defendant's evidence).  In considering the

10 evidence presented, it is abundantly clear that Plaintiffs' motion should be denied in its entirety.

11      **C.    Plaintiffs Have Not Met Their Burden of Demonstrating That They Are**

12             **Similarly Situated To the Putative Class**

13      In seeking conditional certification, "[a] plaintiff bears the burden of establishing that he

14 and the class he wishes to represent are similarly situated." *White v. Osmose, Inc.*, 204 F.Supp.

15 2d 1309, 1313 (M.D. Ala. 2002).  Moreover, a plaintiff "may not maintain a representative action

16 under [section] 216(b) unless all the employees represented are similarly situated." *Brooks v.*

17 *BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 567 (N.D. Ala. 1995)).  Conclusory declarations are

18 also insufficient.   Instead, substantial evidence is required to show similarity among *all*

19 individuals in the proposed class.  *H&R Block Ltd. v. Houdsen,* 186 F.R.D. 399, 400 (E.D. Tex.

20 1999); see also *Brooks*, 164 F.R.D. at 567-69.  Here, Plaintiffs cannot show a common policy to

21 deny minimum wage or overtime to individuals that have judged sanctioned *Magic* events.

22      ***1.    There Is No Evidence Of A Common National Policy or Plan By***

23             ***Wizards That Violates The FLSA***

24      None of Plaintiffs evidence suggests that anyone was the "victim of a single decision,

25 policy, or plan" that violates the FLSA (*Rivera v. Solstice Capital Group, Inc.*, 2008 WL

---

27 ... Q. And when did you meet?  A. We met in 2012.  Q. And in any of the years you've known

28 her, do you know what her relationship or her negotiated compensation with any of the TO's or
   other folks were?  A. No. Q. Do you know the hours that she put into judging?  A. No. Q. And
   she lives at your address?  A. Yes." (Turner Depo., at 74:3-76:1)

14

1    4384123, at \*3 (C.D. Cal. Aug. 21, 2008)), particularly in light of Plaintiff Turner and Shaw's

2    contradictory deposition testimony.  Indeed, Plaintiffs' motion is predicated on the erroneous and

3    unfounded presumption that Wizards classifies Judges as "volunteers" in violation of the FLSA,

4    but Wizards has not taken that position in this case.  Indeed, Plaintiff Turner confirmed that he

5    has been engaged by Wizards not as a volunteer, but as an independent contractor.  (Turner

6    Depo., at 55:10-22 (Q. So you weren't a volunteer when you were working as an independent

7    contractor, were you?  A. No.)  Accordingly, Plaintiffs' citation to, and cursory analysis of, a

8    handful of inapposite "volunteer" cases (Motion, at 20:15-21:15) misses the mark.

9         Plaintiffs' desire to present this as a volunteer misclassification case is not surprising, but

10   their theory simply does not comport with the facts or evidence.  Indeed, while the central issue

11   in Plaintiffs' FLSA claim is whether they performed compensable work in judging sanctioned

12   *Magic* events and were not properly compensated for doing so, Plaintiff Turner and Shaw's

13   deposition testimony highlights the fact that the engagement and compensation of Judges is

14   dictated by multiple third-parties geographically dispersed throughout the United States, with no

15   single policy attributable to Wizards that violates the FLSA.  For example, while some Plaintiffs

16   declare in their declarations that Wizards has never compensated them, the evidence establishes

17   that Shaw, Turner, and Stansfield have been directly engaged by Wizards and compensated for

18   Judge activities performed pursuant to independent contractor agreements.  Separate and apart

19   from that, Turner and Shaw confirmed that Judges regularly receive compensation from stores

20   and tournament organizers for Judging *Magic* events.  (Turner Depo., at 69:10-20).  Even so,

21   there is nothing similar or common as to how those third-parties engage and compensate Judges,

22   and certainly no single directive or decision from Wizards regarding third-party compensation.

23        For example, Judges (not Wizards) in the Southwest United States have compensation

24   guidelines that were developed between the Judges and regional store owners describing how

25   Judges should be compensated for Preliminary Pro Tour Qualifier (PPTQ) events.  (Turner

26   Depo., at 233:3-237:5; *id.*, Exhibit 22).  Turner testified that Judges in his region do not have any

27   such compensation guidelines, and instead negotiate directly with the TO.  (*Id.*, at 236:22-237:5

28   [Q. So at least for PPTQ's, who sets the compensation?  A. Looks like it's negotiated between

1   the judge and the store. Q. How about in your region? A. That way the judge and the store work

2   it out. Q. Okay. What about other events? A. That way; basically between the judge and the

3   tournament organizer]; *Id.*, at 44:12-14). Turner himself estimates that he made $10,000 to

4   $12,000 in 2016, and $8,000 in 2015, judging *Magic* events. (*Id.*, at 62:15-63:11, 69:10-20).

5   Turner concedes that he always charges the store something when he judges an event, never

6   works for free, and negotiates directly with the store. (*Id.*, at 69:10-20).

7        Plaintiffs also suggest that they are seeking compensation for activities allegedly

8   performed outside of actually judging *Magic* events, such as mentoring activities. Given the

9   specific scope of the FLSA claim in the Complaint, those arguments should be ignored. Even if

10  considered, however, Plaintiffs have not presented substantial evidence of any single plan or

11  policy from Wizards violating the FLSA that applies to the broad types of "work" that Plaintiffs

12  contend is compensable. The uniqueness of such a claim and the utter lack of a central unlawful

13  policy is highlighted by the deposition of Plaintiff Shaw, who seeks compensation from Wizards

14  for "mentoring" fellow Judges online without any request from Wizards, reporting of the alleged

15  work to Wizards, or any tracking of time. (Shaw Depo., at 177:18-179:24, 183:18-184:7).[2]

16       Given Plaintiffs' unique theory of liability, this case is completely dissimilar to the

17  volunteer exemption cases that Plaintiffs cite. Factually, it is much more analogous to an off-

18  the-clock cases where certification is regularly denied. In certification motions addressing off-

19  the-clock claims, courts have noted that the presence of express policies prohibiting such off-the-

20

21  _____

22  [2] Specifically, Shaw testified: "Q. Who are you mentoring? A. I still talk quite a bit to many L3s,
    L2s that—at events like Eternal Weekend and – Q. And is your position somebody should be

23  paying you for this mentoring? A. It is my position that all activities that are judge-related should
    be compensated[.] Q. You're not judging, right? A. I'm not judging events. … I am still judging.

24  Q. So who should pay you for this mentoring that you're doing? A. Wizards of the Coast should
    be paying for me. Q. Really? A. – for doing this mentoring, yes. … Q. Has anyone at Wizards

25  of the Coast asked you to continue mentoring after you quit judging? A. There was no specific
    communication from anyone at Wizards of the Coast to continue that, no. QW. So the answer's

26  no one asked you to do it, right? A. No. Q. And have you reported any hours of mentoring to
    anyone at Wizards of the Coast? A. I have not, not. Q. Keep track of the hours? A. I have not,

27  no. … Q. I understood you said you're staying active by hanging out in the chat rooms and
    chatting it up with judges? A. Correct. Q. And in – Your view is you should be paid for that? A.

28  I should be paid for that, yes." (Shaw Depo., at 177:18-179:24)

16

clock work, while not dispositive, tends to contradict the existence of a "common policy" violating the FLSA and therefore is a factor against FLSA certification. *Richie v. Blue Shield of California*, 2014 WL 6982943, at \*10 (N.D. Cal., Dec. 9, 2014) (citing *Richardson v. Wells Fargo Bank, N.A.*, 2012 WL 334038 (S.D.Tex. Feb. 2, 2012) ("Although written policies are not dispositive that an actual plan or practice exists, written policies are relevant considerations when assessing workers' arguments about the existence of a company-wide policy."); *Burch v. Qwest Commc'ns Int'l*, Inc., 500 F.Supp.2d 1181, 1189 (D.Minn.2007) ("The existence of a written policy dictating overtime pay is one factor weighing against conditional certification.")). Here, the predominate "policy" common to the putative class is Wizards' policy that WPN members and premiere TOs retain responsibility for staffing their own events, but regardless of their individualized decisions, in compliance with all federal, state, and local laws with respect to those staff.  Beyond that, Wizards' policy is to enter into independent contractor agreements and compensate the Judges that it engages for the limited number of Wizards-run events in the United States, and Grand Prix head judges prior to January 1, 2017.

Plaintiffs have failed to present evidence indicating that either of these policies apply uniformly to the putative class in a manner that violates a provision of the FLSA.  Aside from their own self-serving and contradicted declarations, Plaintiffs provide nothing that would support a finding that their experiences are similar to those of the expansive nationwide class they seek to conditionally certify.  In fact, the only real uniformity in Plaintiffs' allegations stem from the fact that they and two opt-in Plaintiffs signed boilerplate declarations that don't even assert an actionable individual violation of the FLSA, let alone a class-wide violation, which are insufficient to support conditional certification.  See, e.g., *Silverman v. SmithKline Beecham Corp.*, 2007 WL 6344674, at \*2, fn. 5 (C.D. Cal. Oct. 15, 2007) (noting that the court "strongly disapproves of the use of boilerplate attorney-drafted declarations" and questioning "whether such boilerplate 'testimony' would be sufficient to meet Plaintiff's evidentiary burden").

Where the evidence presented by the parties demonstrates that any alleged "policy" to deny compensation under the FLSA was "not even uniformly or systematically implemented at any given store," conditional certification is inappropriate. *Basco,* U.S. Dist. LEXIS 12441, at

17

1    \*22 (denying collective action certification where information presented demonstrated that any

2    alleged "policy" and its effects are neither homogenous nor lend themselves to collective

3    inquiry"); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 362-370 (D.N.J. 1987) (holding a proposed

4    class not to be similarly situated because employment decisions were made "by different

5    supervisors … on a decentralized employee-by-employee basis.")  That is the case here, as the

6    parties' evidence demonstrates.  Conditional certification should therefore be denied.

7            **2.**    *Any Judge's Entitlement to Wages Requires An Individualized, Fact-*

8                *Specific Inquiry Unsuitable for Collective Action Treatment*

9        Courts regularly deny 216(b) notice when allegations and evidence presented show that

10   adjudication of the claim will require individual inquiries.  *Holt,* 333 F.Supp.2d at 1274-75

11   (denying certification where individualized nature of the claims would diminish "economy of

12   scale envisioned by the FLSA collective action"); *Basco v. Wal-Mart Stores, Inc.,* 2004 U.S.

13   Dist. LEXIS 12441 (E.D. La. July 2, 2004) (denying certification where "potential defenses to

14   any alleged FLSA overtime violations will require highly individualized evidence concerning

15   each associate"); *Reich v. Homier Distributing Co.*, 362 F.Supp.2d 1009, 1013-14 (N.D. Ind.

16   2005); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Ir. 2002).

17        As discussed above, Plaintiffs fail to present evidence of a single decision, policy, or plan

18   germane to their FLSA claim, which seeks minimum wage and overtime under the FLSA for

19   alleged uncompensated work performed as Judges *at sanctioned Magic events*.  However,

20   contrary to Plaintiffs' suggestion, this is not an exemption case or otherwise suited for proceeding

21   on a collective basis.  Rather, in light of the fact that Judges participated in events for 4,500

22   separate stores and TOs throughout the United States, under varying relationships with highly

23   divergent compensation policies, the instant action is factually more analogous to an "off the

24   clock" case.  Because such cases involve a multitude of individualized issues, certification is

25   regularly denied.  *Castle v. Wells Fargo Financial, Inc.*, (N.D. Cal. Feb. 20, 2008) 2008 WL

26   495705, \*2; *Velasquez v. HSBC Finance Corp.* (N.D. Cal. 2010) 266 F.R.D. 424.

27        In *Simmons v. T-Mobile USA, Inc.*, 2007 WL 210008 (S.D. Tex. Jan. 24, 2007), the court

28   denied certification because the case involved "claims of 'off the clock' unpaid overtime, where

allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate Defendant's clear, lawful written policies at some or many of Defendant's more than one hundred different retail location." *Id.* at *6. Similarly here, the only policy applicable to most sanctioned events is the WPN Terms & Conditions, which provides that WPN members are responsible for staffing their events and agree to comply with all applicable employment laws. Determining whether Judges engaged in compensable activities under the FLSA in judging such events, and if so whether any such liability can be extended to Wizards, is highly individualized such that certification should be denied. *Hinojos v. The Home Depot, Inc.*, 2006 WL 3712944 (D. Nev. Dec. 1, 2006) (denying certification because plaintiffs did "not point to a common policy or practice on a nationwide, or even statewide, basis" and "the need for individualized determinations to resolve the claims of each plaintiff").

Plaintiffs' failure to present evidence of a single decision, policy, or plan highlights the individual nature of their FLSA claim as set forth in the Complaint, rendering it wholly inappropriate for collective action certification. Each of Plaintiffs' individual FLSA claims rest on distinct facts that dictate a separate, Plaintiff by Plaintiff analysis into each sanctioned event that a Plaintiff may have judged since April 12, 2013. A similar fact-specific analysis would be required for any potential opt-in Plaintiff. Indeed, resolution of Plaintiffs' claims for unpaid minimum wage and overtime for judging *Magic* events—the only FLSA claim at issue in the complaint—would require inquiry into each and every one of the over one million sanctioned events held throughout the United States, including the relationship between the Judge and the store or tournament organizer, whether the Judge received compensation for services rendered, an analysis as to whether the Judge is entitled to additional wages under the FLSA, and a determination as to whether Wizards can be held liable for any such wages as an employer, joint-employer, or other theory extending the protections of the FLSA, among other inquiries.

Finally, each potential plaintiff will also be subject to individualized defenses by Wizards. Courts regularly decline to certify unpaid wage cases like this because the putative employer is entitled to raise claimant-specific defenses. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 359 (D. N.J. 1987). For these additional reasons, Plaintiffs' motion should be denied.

### 3. The Court Should Deny Plaintiffs' Motion Due To The Overbroad Geographic Scope of the Proposed Collective of Judges

Courts often refuse to order notice under Section 216(b) to a nationwide or geographically expansive class where the plaintiffs present evidence regarding alleged practices in a limited number of locations. *Williams v. Accredited Home Lenders, Inc.*, 2006 U.S. Dist. LEXIS 50653 (N.D. Ga. July 25, 2006); *Bernard v. Household Int., Inc.*, 231 F.Supp.2d 433 (E.D. Va. 2002). Unsupported allegations of a nationwide policy, without more, cannot justify nationwide notice under Section 216(b). *Tucker v. Labor Leasing, Inc.*, 872 F.Supp. 941, 949 (M.D. Fla. 1994).

In *Ray v. Motel 6 Operating Ltd.*, 1996 U.S. Dist. LEXIS 22565 (D. Minn. Mar, 18, 1996), for example, the court denied authorization for collective action notice to a proposed class of between 1,000 and 1,500 present and former assistant managers spanning 775 nationwide properties, even though the plaintiffs alleged that all assistant managers were employed by the same corporate entity pursuant to a similar managerial plan. *Id.* at *5-6. In denying the request, the court found that the discrepancies between assistant managers' employment circumstances— i.e. working in 20 different states at 39 different properties—demonstrated that proceeding as a collective action was inappropriate. *Id.*; see also *McQuay v. American Int'l Group Inc.*, 2002 U.S. Dist. LEXIS 21307 (E.D. Ark. 2002), at *7-10 (limiting notice to employees in 2 out of 28 states because plaintiff presented insufficient evidence regarding practices in excluded states).

In this case, Plaintiffs propose sending notice to a nationwide putative class of over 3,850 Judges, in all 50 states, despite the fact that their "evidence" is limited to declaration testimony from six individuals (just 0.15% of the number of individuals that Plaintiffs seek to represent) that have Judged in only 10 states since April 12, 2013. (Bazakas Decl., at ¶¶ 20-23). Coupled with the fact that Turner and Shaw's declarations are repeatedly contradicted by their own sworn deposition testimony, there can be no doubt that Plaintiffs have submitted insufficient evidence to support nationwide notice. Beyond geography, Plaintiffs have failed to demonstrate that each level of Judge (i.e. L1-L5 under the old system, L1-L3 under the new system) is similarly situated to one another, or that all sanctioned event types are the same. As the evidence makes clear, there are substantial differences in how Judges have been engaged and compensated for

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION
FPDOCS 33017936.1

1  sanctioned *Magic* events, eviscerating any notion of similarity among the entire class. For all of

2  these reasons, Plaintiffs' Motion should be denied in its entirety, or at the very least, substantially

3  limited both in geographic scope and to only the events that are actually run by Wizards.

4        **D.**    **Fairness And Procedural Considerations Make A Collective Action**

5            **Improper, Providing An Independent Reason To Deny Plaintiffs' Motion**

6        Fairness and procedural factors also weigh against proceeding with this case as a

7  collective action. To that end, judicial economy is not served by joining disparate claims together

8  into "a monster that no one can deal with." *EEOC v. MCI Int'l, Inc.*, 829 F.Supp.1438, 1445-46

9  (D. N.J. 1993). As discussed above, the issues in this case are highly individualized. Trial on

10  Plaintiffs' FLSA claim would dissolve into a series of hundreds of mini-trials, which contravenes

11  the purpose of Section 216(b) of the FLSA. *Trinh v. JP Morgan Chase & Co.*, 2008 WL

12  1860161, at *5 (S.D. Cal. April 22, 2008) ("Because of the individualized inquiries involved, the

13  Court finds that judicial economy would not be advanced by allowing this suit to proceed as a

14  collective action"). Proceeding on a collective basis would also create an unwieldy case, present

15  a challenge to even the most sophisticated jury, and compromise Wizards' due process rights to

16  a fair trial. See, e.g., *Lusardi v. Zerox Corp.*, 118 F.R.D. 351, 372 (D. NJ. 1987).

17        The Court should not expand this case to facilitate notice to thousands of individuals

18  where Plaintiffs have not demonstrated that these issues can be fairly adjudicated on a collective

19  basis. *Saleen, supra,* 2009 U.S. Dist. LEXIS 49891, at *28-30 (denying certification because

20  plaintiffs failed to show that the case was "manageable as a collective action"); *Gromek v. Big*

21  *Lots, Inc.*, 2010 WL 5313792, at *5 (N.D. Ill. Dec. 17, 2010) (denying conditional certification

22  where the claims were not manageable); *Freeman v. Wal-Mart Stores, Inc.*, 256 F.Supp.2d 941,

23  945 (W.D. Ark. 2003) (noting it "would be a waste of the Court's and the litigants' time and

24  resources to notify a large and diverse class only to later determine that the matter should not

25  proceed as a collective action because the class members are not similarly situated").

26        As addressed herein, Plaintiffs' contention that Judges are uniformly treated as

27  "volunteers" and are not compensated is patently incorrect and inaccurate. (See, e.g., Turner

28  Depo., at 55:10-22 [Q. Now, you've been an independent contractor as a judge, right? A. I have

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

FPDOCS 33017936.1

1  been termed as one, yes.  Q. You have been paid as one?  A. Yes. Q. So you weren't a volunteer

2  when you were working as an independent contractor, were you?  A. No].).  Rather, the evidence

3  demonstrates that Judges at sanctioned *Magic* events are engaged under varying arrangements

4  by hundreds of different entities: whether by Wizards in limited circumstances, retail stores,

5  and/or TOs throughout the United States.  Each individual plaintiff is therefore subject to

6  different compensation practices and policies that Judges themselves negotiate.  (Turner Depo.,

7  at 69:10-20 [Q. Do you always charge the store something?  A. Yes. Q. So you never work for

8  free?  A. Correct.  Q. And you negotiate that with the store?  A. Yes].).

9       Moreover, Plaintiffs Turner, Shaw, and Stansfield have all been directly engaged by

10  Wizards as independent contractors to Judge various events.  In each instance, they entered into

11  a written independent contractor agreements and were compensated for the agreed-upon scope

12  of work.  Plaintiff Turner admits that he has also been engaged as an independent contractor via

13  written contract by at least one third-party tournament organizer, Star City Games, where he

14  received compensation for judging a sanctioned *Magic* event.  Additionally, Plaintiffs Shaw and

15  Turner testified that different stores and tournament organizers vary in the manner in which they

16  go about engaging and compensating Judges for events that they run.  (Turner Depo., at 188:18-

17  190:1, 233:3-237:5; Shaw Depo., at 31:17-33:25, 34:14-25, 94:3-17, 262:16-263:25, 294:2-20).

18       If certified by the Court, this collective action would potentially include: i) individuals

19  that have judged one of the limited number of *Magic* events run by Wizards in the United States,

20  and therefore entered into an independent contractor agreement and were compensated by

21  Wizards for their services; ii) retail store owners that have been certified as Judges and judge

22  sanctioned events in their own stores; iii) employees of retail locations that serve as Judges at in-

23  store events as part of their regular employment with the store; iv) individuals playing in Magic

24  events that also participate as the Judge for that event; v) employees of premiere tournament

25  organizers that judge sanctioned events as part of their employment with the tournament

26  organizer running the event; vi) individuals that enter into limited employment or independent

27  contractor agreements with stores or tournament organizers to run specific sanctioned *Magic*

28  events and receive compensation that they negotiate; vii) individuals that are judging at a store

1    for a friend, as Plaintiff Shaw testified, without an expectation of compensation; and viii)

2    individuals who are not certified judges but are listed as a judge for purposes of reporting the

3    results of non-competitive but still sanctioned *Magic* events.  (Shaw Depo., at 61:12-62:16,

4    87:24-88:21, 90:2-91:5, 196:5-9; Bazakas Decl., at ¶ 11; Bergot Decl., at ¶ 21.)  This would result

5    in an unwieldy collective that is neither similarly situated nor manageable.

6        Given that retail stores and third-party TOs decide if and how to engage Judges, whether

7    to classify them as employees, independent contractors, or neither, and what remuneration to

8    provide, if any, the Court would be required to supervise hundreds if not thousands of "mini-

9    trials" to determine whether these third-parties "employed" Judges at sanctioned events and

10   violated the FLSA by failing to pay proper wages, and whether Wizards can be held liable for

11   any such failure under the FLSA.  In light of the differences even among Plaintiffs, this case is

12   simply not appropriate for collective treatment.  As such, Plaintiffs' motion should be denied.

13   **IV.    IF THIS COURT GRANTS PLAINTIFFS' MOTION, A REVISED 216(B)**

14   **NOTICE SHOULD BE SENT BY WIZARDS OR A THIRD PARTY**

15   **ADMINISTRATOR WITH A 45 DAY OPT-IN PERIOD**

16       Under various state laws (including California), individuals have a privacy interest in

17   personal information entrusted to a third-party, and the custodian of records of that information

18   has a duty to resist attempts at unauthorized disclosure.  See, e.g., *Board of Trustees v. Superior*

19   *Court*, 119 Cal.App.3d 516, 525-26 (1981).  Similarly, federal courts have held that individuals

20   have a privacy interest in not having names and addresses disclosed without their consent. *See*

21   *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994).  Here, Plaintiffs

22   propose the use of a third-party administrator, but request that private information for all putative

23   class numbers be provided to Plaintiffs.  If the Court permits notice, it should be sent by Wizards

24   or a court-appointed third-party administrator who will ensure that confidential information is

25   protected.  If notice is ordered, it can be sent by Wizards or by a third party administrator. *See*

26   *Lewis v. Wells Fargo & Co.*, 669 F.Supp.2d 1124, 1128 (N.D. Cal. Oct. 26, 2009) (requiring

27   notice by third-party claims administrator). Individuals who choose to opt-in to the action will

28   provide their name and contact information on the returned consent form.  Only in returning a

1   consent form does an individual indicate a willingness to participate in the action, to be

2   represented by Plaintiffs' counsel, and, impliedly, to the disclosure of private information.  No

3   compelling reason justifies the production of this private information to Plaintiffs.

4        Additionally, Plaintiffs ask the Court to approve an opt-in period that extends for 75 days.

5   That time period is excessive and beyond what courts typically allow.  An opt-in period of 45

6   days is sufficient barring extraordinary circumstances.  As no such circumstances are present

7   here, and Plaintiffs have already spent substantial time soliciting opt-ins, the Court should limit

8   the opt-in period to forty-five (45) calendar days.  See, e.g., *Baden-Winterwood v. Life Time*

9   *Fitness,* 2006 U.S. Dist. LESIX 53556, *8 (S.D. Ohio, Aug. 2, 2006).

10       Finally, there are numerous deficiencies in Plaintiffs' proposed notice.  In sum, the notice

11  (i) does not adequately inform putative class members that they may be responsible for costs

12  should Wizards prevail (see, e.g., *Adams*, 242 F.R.D. at 540-41); (ii) contains multiple instances

13  of deceptive language; (iii) provides for an unreasonably long notice period; (iv) contains

14  ancillary information not germane to a 216(b) notice; and (v) fails to protect the privacy rights of

15  non-parties.  Rather than burden the Court at this stage with all of the deficiencies, Wizards

16  propose that if the Court conditionally certifies a class, it allow two weeks for Wizards to propose

17  an alternative notice and confer with Plaintiffs' counsel to narrow any disputes.  Courts routinely

18  allow the parties an opportunity to meet and confer about these issues. *See, e.g., Mark v. Gawker*

19  *Media LLC*, 2014 U.S. Dist. LEXIS 114011, at *23 (S.D.N.Y. Aug. 15, 2014).

20  **V.     CONCLUSION**

21       For all of the foregoing reasons, the Court should deny Plaintiffs' Motion for Conditional

22  Certification in its entirety.

23

24  DATE: June 28, 2017                    FISHER & PHILLIPS LLP

25                              By:    /s/ Shaun J. Voigt_____
                                      KARL R. LINDEGREN
26                                    SHAUN J. VOIGT
                                      Attorneys for Defendant,
27                                    WIZARDS OF THE COAST LLC

28

WIZARDS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

# CERTIFICATE OF SERVICE

I, the undersigned, am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; am employed with Fisher & Phillips LLP and my business address is 444 South Flower Street, Suite 1500, Los Angeles, California 90071.

On June 28, 2017, I served the foregoing document entitled **DEFENDANT WIZARDS OF THE COAST LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND TO FACILITATE NOTICE UNDER 29 U.S.C. § 216(b)** on all the appearing and/or interested parties in this action by placing ☐ *the original* ☒ *a true copy* thereof enclosed in sealed envelope(s) addressed as follows:

## SEE ATTACHED MAILING LIST

☒ **[by ELECTRONIC SUBMISSION]-** I served the above listed document(s) described via the United States District Court's Electronic Filing Program on the designated recipients via electronic transmission through the CM/ECF system on the Court's website. The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

☒ **FEDERAL-** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed June 28, 2017 at Los Angeles, California.

MARVIN JOHNSON _____          By: */s/ Marvin Johnson* _____
   Print Name                                                                  Signature

CERTIFICATE OF SERVICE

FPDOCS 33017936.1

1

<u>MAILING LIST</u>

2

| | |
|---|---|
| Matt Righetti, Esq.<br>John Glugoski, Esq.<br>RIGHETTI GLUGOSKI, PC<br>456 Montgomery St., Suite 1400<br>San Francisco, CA 94101<br>Telephone: (415) 983-0900<br>Facsimile: (415) 397-9005<br>Email: matt@righettilaw.com<br>jglugoski@righettilaw.com | Attorneys for Plaintiffs,<br>ADAM SHAW, PETER<br>GOLIGHTLY, JUSTIN TURNER,<br>and JOSHUA STANSFIELD |
| Reuben D. Nathan, Esq.<br>NATHAN & ASSOCIATES, APC<br>600 W. Broadway Ste. 700<br>San Diego, CA 92101<br>Telephone: (619) 272-7014<br>Facsimile: (619) 330-1819<br>Email: rnathan@nathanlawpractice.com | Attorneys for Plaintiffs,<br>ADAM SHAW, PETER<br>GOLIGHTLY, JUSTIN TURNER,<br>and JOSHUA STANSFIELD |
| Ross Cornell, Esq.<br>ROSS CORNELL, ESQ., APC<br>111 W. Ocean Blvd., Suite 400<br>Long Beach, CA 90802<br>Telephone: (562) 612-1708<br>Facsimile: (562) 394-9556<br>Email: ross.law@me.com | Attorneys for Plaintiffs,<br>ADAM SHAW, PETER<br>GOLIGHTLY, JUSTIN TURNER,<br>and JOSHUA STANSFIELD |
| David Borgen, Esq.<br>James Kan, Esq.<br>Katharine Fisher, Esq.<br>Goldstein, Borgen, Dardarian & Ho<br>300 Lakeside Drive, Suite 1000<br>Oakland, CA 94612<br>Telephone: (510) 763-9800<br>Facsimile: (510) 835-1417<br>Email: dborgen@gbdhlegal.com | Attorneys for Plaintiffs,<br>ADAM SHAW, PETER<br>GOLIGHTLY, JUSTIN TURNER,<br>and JOSHUA STANSFIELD |
| Michael Malk, Esq.<br>MICHAEL MALK, ESQ. APC<br>1180 S. Beverly Drive, Suite 302<br>Los Angeles, California 90035<br>Telephone: (310) 203-0016<br>Facsimile: (310) 499-5210<br>Email: mm@malklawfirm.com | Attorneys for Plaintiffs,<br>ADAM SHAW, PETER<br>GOLIGHTLY, JUSTIN TURNER,<br>and JOSHUA STANSFIELD |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE