# EXHIBIT "B"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CASE NO.  4:16-cv-01924-EJD

ADAM SHAW, PETER GOLIGHTLY,
JUSTIN TURNER, and JOSHUA
STANSFIELD, as individuals and on
behalf of others similarly situated
and the general public,

        Plaintiffs,

vs.

WIZARDS OF THE COAST LLC,

        Defendant.

_____/

101 East Kennedy Boulevard
Tampa, Florida
9:41 a.m. to 5:27 p.m.
April 25, 2017


VIDEOTAPED DEPOSITION OF JUSTIN TURNER


        Taken on behalf of the DEFENDANT before Kim
Auslander, RPR, CRR, Notary Public in and for the State
of Florida at Large, pursuant to Notice of Taking
Deposition in the above cause.

Page 2

```
 1    APPEARANCES:

 2

      ATTORNEYS FOR PLAINTIFF
 3
              DAVID BORGEN, ESQ.
 4            GOLDSTEIN, BORGEN, DARDARIAN & HO
              300 Lakeside Drive
 5            Oakland, California 94612

 6

 7
      ATTORNEYS FOR DEFENDANT
 8
              KARL L. LINDEGREN, ESQ.
 9            FISHER PHILLIPS LLP
              2050 Main Street
10            Irvine, California 92614

11

12

13

14

15    ALSO PRESENT: Rob Turner, Esq.

16                 Nicholas Mitchell, Esq.

17                 Helene Bergeot

18                 Greg Scrivener, Videographer

19

20

21

22

23

24

25
```

Page 3

1                          I N D E X

2

     Deposition of JUSTIN TURNER              Page No.
3

4    Examination by Mr. Lindegren                 7

5    Witness Signature Page                      294

6    Certificate of Oath of Witness             296

7

8

9                          *  *  *

10                     E X H I B I T S

11   DEFENDANT'S

12   No.                  Description         Page No.

13   Exhibit 1           *Confidential document*      21
                         (Settlement Agreement/Release)
14

15   Exhibit 2           *Confidential document*      21
                         (IRS Compliance Letter
16   )

17   Exhibit 3           *Confidential document*      81
                         (10-99's)
18

19   Exhibit 4           E-mail string               92

20   Exhibit 5           E-mail string               99

21   Exhibit 6           Service Agreement          104

22   Exhibit 7           Service Agreement          108

23   Exhibit 8           Service Agreement          112

24   Exhibit 9           Service Agreement          117

25              (Exhibits continued on next page.)

1       A      Yes; I gave the current one to my lawyers.

2   They have at least this year's and last year's.

3       Q      But you have other ones?

4       A      I have the one from 2015 and I have the ones

5   that are pursuant to working pro tours with Wizards,

6   yes.

7       Q      And did you produce any 10-99's?

8       A      No.

9       Q      Why not?

10      A      I wasn't aware I had to produce 10-99's,

11  again, because those would be things Wizards would have

12  filed as well.

13      Q      Did you produce any contracts with other TO's?

14      A      No.  I don't have any.

15      Q      Have you ever received compensation from a TO?

16      A      Not directly.  Well, I got -- this year I did

17  from Star City Games, I signed a contract and had an

18  event, but it was a month ago.

19      Q      Okay.  Did you bring that today?

20      A      No.

21      Q      Where is that contract?

22      A      It would be in my e-mail.

23      Q      You signed a contract with Star City Games?

24      A      Yes.

25      Q      For which event?

1        A      For Grand Prix in Orlando.

2        Q      And what was your role there?

3        A      Floor judge.

4        Q      Did they pay you?

5        A      They did.

6        Q      What did they pay you?

7        A      $750.

8        Q      As an employee or an independent contractor?

9        A      As an independent contractor.

10       Q      What record do you have of the payment?

11       A      They gave me a check.  I have -- I don't think

12  I have the stub anywhere still, but it would be in my

13  bank records when I deposited it.

14       Q      Did you bring those with you today?

15       A      No.

16       Q      How much time did you spend looking for

17  documents with respect to what was requested?

18       A      I would say about 15, 20 hours from finding

19  the ways and means to even get into my e-mail and pull

20  stuff from five, six years ago all the way through until

21  now, to put it into a format to where I could bundle it

22  all together and send it as one file, looking through my

23  social media accounts, looking through Slack, having a

24  conversation to see if we can get older history in the

25  Slack channel, and coming up with search terms that gave

1    the game, you can win invites to certain things in the

2    real world, but mostly it's you just win online currency

3    and things of that nature to continue to play online.

4    They are all technically sanctioned.  I don't actually

5    know that answer.

6          Q      You don't know whether they are or not?

7          A      Online, no.

8          Q      Okay.  And is there a website you go to to

9    play online?

10         A      It's a program, computer program.

11         Q      That you buy or --

12         A      It's free, but you have to buy the cards.

13         Q      And where do you get the program?

14         A      From Wizards' website.  It's a Wizards

15   product.  Wizards Magic online.

16         Q      So you went to Wizards.com and uploaded the

17   program?

18         A      Uh-huh.

19         Q      Yes?

20         A      Yes.

21         Q      And you play against other people online?

22         A      Yes.

23         Q      Okay.  And when's the last time you played any

24   live tournament?

25         A      It would be probably the Shadows Over

1    Innistrad or the Eldridge Moon prerelease, so those

2    would be summer of last year.

3          Q    And where were those?

4          A    Those were at a store in Palm Harbor called

5    Short Stops Cards and Games.

6          Q    Was there an entry fee?

7          A    Yes.

8          Q    How much was it for the Shadows?

9          A    $25.

10         Q    And who did you pay that to?

11         A    To the store owner.

12         Q    Who's that?

13         A    Justin Vickers.

14         Q    Is he a friend of yours?

15         A    Yeah.

16         Q    How do you spell Vickers?

17         A    V-I-C-K-E-R-S.

18         Q    On the second one, the Eldridge Moon, what was

19   the entry fee?

20         A    Same.

21         Q    25 bucks?

22         A    Yup.

23         Q    Same guy?

24         A    Yup.  Him or his brother.  His brother's name

25   is Travis.

```
 1      Q      And they own the store?

 2      A      Yes.

 3      Q      And do they put on Friday Night Magic too?

 4      A      They do.

 5      Q      Do you judge for them?

 6      A      I do not.

 7      Q      Do they judge their own Friday Night Magic?

 8      A      They have other people that do it.

 9      Q      Who?

10      A      Ben McDole and a guy named Billy -- Greek --

11   Vasilaskis.

12      Q      Are they employees of the store?

13      A      They are not.

14      Q      And do Steve or -- does Justin Vickers pay

15   him?

16      A      I'm unaware of their arrangement.

17      Q      You don't know?

18      A      Yeah.

19      Q      Were there judges at the two events that you

20   played?

21      A      There were.

22      Q      And do you know who paid them, if anyone?

23      A      I am unaware.

24      Q      And who organized those tournaments?

25      A      That would be either the store -- it would be
```

Page 43

1    the store.

2         Q    The Vickers brothers?

3         A    Yeah.

4         Q    And what do they do with the entry fee, if you

5    know?

6         A    I have no idea.  Put it in the cash register.

7         Q    That's a good place for it.

8         A    Yeah.

9         Q    Either that or go buy some beer.

10        A    Whatever they do with it is their business.

11        Q    How many people were in the first one, the

12   Shadows?

13        A    It would be 60 or so for both.  They were

14   midnight events.

15        Q    Meaning they started at midnight?

16        A    Yeah.

17        Q    How late do those go?

18        A    Until about 4, 5 in the morning.

19        Q    Okay.  So four, five hours?

20        A    Yeah.

21        Q    And that's at the store?

22        A    Yes.

23        Q    When did you decide that you wanted to be a

24   class rep for a wage hour lawsuit?

25        A    It would be about March or April of last year.

1    Q    So March, April 2016?

2    A    Yup.

3    Q    And why did you decide to do that?

4    A    There was a couple reasons.  First was I was

5    unfairly suspended along with all of my region by people

6    at Wizards of the Coast on the week of Christmas in

7    2015, and it was an atrocious couple weeks trying to get

8    that work through their various channels.

9         It was completely done wrong.  I was lied to

10   by them over the phone, then I was suspended with no

11   avenue of recourse.  I wasn't allowed to participate in

12   tournaments.  It cost the judges in my region tens of

13   thousands of dollars in lost opportunity wages for the

14   suspension that they didn't even see coming.  That had

15   me pretty perturbed by January of 2016, when I finally

16   got the suspension revoked towards the end of the month.

17        Then after that I was reinstated as a regional

18   coordinator, and we were talking about the contractual

19   issues.  I actually had a conversation with Mr. Mitchell

20   about the issues that I had with the contract because

21   they had violated some of the clauses on that contract

22   when they suspended me at the tail end of 2015.

23        After a brief conversation with Mr. Mitchell,

24   I heard from the judge manager at the time, Sarah Smith,

25   that they were not interested in making any alterations

Page 55

1        The WPN is the Wizards Play Network; it is

2    their organization of stores.

3        Q    Did you produce the articles?

4        A    No; again, because those are Wizards

5    documents.  I didn't think I would -- those are things

6    they have.

7        Q    Okay.  Anything else where you think someone

8    said that judges are volunteers?

9        A    No.

10        Q    Now, you've been an independent contractor as

11    a judge, right?

12        A    I have been termed as one, yes.

13        Q    You have been paid as one?

14        A    Yes.

15        Q    So you weren't a volunteer when you were

16    working as an independent contractor, were you?

17        A    No.

18        Q    You said that the judges in your region,

19    because of the suspension related to the leaked card,

20    had tens of thousands of dollars in potential losses; is

21    that right?

22        A    That is correct.

23        Q    Okay.  Which judges were suspended in your

24    region?

25        A    There was 13 of them, so I won't remember them

1       A       He called me and told me about it.   I

2  confirmed it with Wizards.

3       Q       Who did you confirm it with?

4       A       Aaron Hamer.

5       Q       Verbally or in writing?

6       A       Verbally, then I checked the DCI suspended

7  players, and he was on there.

8       Q       For two years?

9       A       Yes.

10      Q       Has he been reinstated?

11      A       He got it reduced to a year upon appeal, so

12 he's been reinstated as of now.   I believe his

13 suspension expired December of 2016.

14      Q       Okay.   And prior to that do you know how many

15 events he judged?

16      A       Adam?

17      Q       Yes.

18      A       No.

19      Q       Do you know how much money he made judging?

20      A       No.

21      Q       Do you know if he made any?

22      A       I have no idea.

23      Q       Do you know if he ever had a contract?

24      A       I do not believe he did.

25      Q       Do you know one way or the other?

```
1      A     I do not know for sure.

2      Q     Do you know which TO's he worked for?

3      A     No.

4      Q     Do you know what events he judged?

5      A     I mean, I could look it up.  I don't know --

6      Q     Where would you look it up?

7      A     How?

8      Q     Where would you look it up?

9      A     Oh, on his judge membership page.

10     Q     Judge Apps?

11     A     Judge Apps now, because Judge Center would

12   have just went down.  It would have been Judge Center up

13   through two weeks ago.

14     Q     Who created Judge Apps?

15     A     Jason Lemahieu.

16     Q     Who's the administrator?

17     A     I believe him; Jason.

18     Q     Have you talked to Hubble about joining the

19   lawsuit?

20     A     Yes.

21     Q     What did he tell you?

22     A     I believe he just signed on as a member of the

23   class.

24     Q     What did you tell him?

25     A     I told him the basic tenace of what we were
```

1       A      Yeah.   Matt Williams and Ben McDole, the

2  figure -- the money figure that I came up with was from

3  looking at the tournaments for the Level 3's, just the

4  Level 3's, which was me, Ben, Matt Williams, Brian

5  Prillaman, and the events that we were scheduled to go

6  to, because we were also told we couldn't apply for

7  tournaments while we were suspended.

8          So we had this whole potential six-month gap,

9  if we had served our three months and were not allowed

10 to apply for events in those three months as well,

11 six-month gap in events, and at that time a Level 3

12 judge was doing fairly decently so far as the foils and

13 whatnot and the cards we were getting paid, so there was

14 a lot of lost opportunity wages there.

15      Q      Well, how much were you making a year as an

16 L-3?

17      A      Last year, I probably made 10, $12,000

18 judging.

19      Q      Under your independent contractor agreement?

20      A      No.

21      Q      Outside of that?

22      A      Yes.   The independent contractor agreement is

23 for regional coordinator.   It has nothing to do with

24 actual judging that I made $10,000 on.

25      Q      So you made 10 to $12,000 judging?

1     A     Yes.

2     Q     Who paid you?

3     A     For that 10 to 12 grand, that came from the

4  tournament organizers.

5     Q     Which ones?

6     A     Star City Games, predominantly; Pastimes.  I

7  think those are the only ones I worked for for those

8  large events.

9     Q     And where are the records of those payments?

10    A     It would have been checks, so probably my bank

11  records.

12    Q     Did you produce those?

13    A     No.

14    Q     Why not?

15    A     I wasn't aware I had to produce my bank

16  statements.

17    Q     We asked you for records of payments by

18  tournament organizers.

19    A     Oh, I'm sorry; I must have missed that part.

20    Q     Anyone other than Star City and Pastimes pay

21  you in 2016?

22    A     In money, no, I don't think so.

23    Q     So they paid you 10 or 12 grand cash?

24    A     In checks, yeah.

25    Q     They also gave you swag?

1       A     No.   This was after those days were done.

2       Q     Did you receive any other compensation in

3    2016?

4       A     From little stores and stuff, sometimes

5    working small events, regional pro tour qualifiers, and

6    things of that nature.

7       Q     Where are your records of that?

8       A     I don't have records of that.   There's nothing

9    on paper.

10      Q     What stores paid you?

11      A     I have to think on that for a second.

12      Q     Okay.

13      A     Jax Game Center paid me for an RPTQ in that

14   year in Jacksonville, Armada Games in Tampa paid me for

15   pre-release.

16      Q     You negotiated your compensation with Armada,

17   right?

18      A     Yes.

19      Q     Wasn't there an issue with a card you weren't

20   supposed to get?

21      A     Yeah.   That was in 2014.

22      Q     We'll go back to that then.   We will go

23   backwards.

24      A     Okay.

25      Q     So 2016, who else?

1       A     Again, I was unaware you needed records of

2   that stuff, but I can get that for you.

3       Q     And how much did Jax pay you?

4       A     They gave me some boxes that they were given

5   from Wizards.

6       Q     How do you know who gave them the boxes?

7       A     Because they told me.

8       Q     Beyond what they told you, do you know where

9   they got the boxes?

10      A     No.

11      Q     How many boxes did they give you?

12      A     Six.

13      Q     At 140 each?

14      A     Well, they don't actually sell for 140 each.

15  That is the retail value.  Nobody sells at retail.  I

16  could sell them for about 80.

17      Q     Okay.  So $480?

18      A     Yeah.  That was for two days plus travel; I

19  had to drive to Jacksonville, and hotel for two nights.

20      Q     Okay.  Did you charge them for hotel and

21  travel?

22      A     They booked the hotel.

23      Q     They paid for the hotel?

24      A     Yes.

25      Q     What else did they do?

Page 69

1   you've judged?

2       A    Hardly any.  Just my event records.  So I

3   would be able to easily tell you any Grand Prixes or

4   large events that I worked, because those would be on my

5   event history.  Other than that, I don't keep

6   everything.

7       Q    So the little ones you don't -- just would be

8   your memory?

9       A    Correct.

10      Q    Do you always charge the store something?

11      A    Yes.

12      Q    So you never work for free?

13      A    Correct.

14      Q    And you negotiate that with the store?

15      A    Yes.

16      Q    In 2015, how much did you make judging?

17      A    It would have been about the same, slightly

18  less.

19      Q    Okay.

20      A    Maybe about 8,000.

21      Q    And that includes the small stores?

22      A    Yes.

23      Q    And boxes?

24      A    Yes.

25      Q    What small stores did you work for?

Page 74

1    and complete testimony, Mr. Turner?

2         A    Yes, sir.

3         Q    Katie Temple; is that your fiance?

4         A    Yes, sir.

5         Q    How much did she make in 2016 judging?

6         A    Unaware.

7         Q    Did she judge?

8         A    She did.

9         Q    Where?

10         A    Let's see.  I believe she did -- actually, no,

11   she didn't in 2016.  She didn't judge any big

12   tournaments.  She judged a couple local things for

13   stores.  I am unaware of what compensation she received.

14         Q    Which stores?

15         A    She worked at a local comic bookstore called

16   Emerald City, she did a tournament at a local store

17   called Serenity Games.  I believe that would be the

18   extent of the stores she worked for.

19         Q    Did she judge Friday Night Magic?

20         A    Yes.

21         Q    That's where those were?

22         A    At Serenity, yes.

23         Q    And she negotiated with the store owner if

24   there was any compensation?

25         A    I believe so.

1      Q      She didn't tell you what it was?

2      A      No.

3      Q      Do you know what her earnings from being a

4   judge were in 2012, '13, '14, or '15?

5      A      No, sir.

6      Q      Any idea?

7      A      No, sir.

8      Q      Do you know what tournaments she worked at?

9      A      The only big tournament I'm aware of that she

10  worked at was a tournament in Japan that she came to

11  with me, and I think it was 2015 in Sheba.

12     Q      She was a judge?

13     A      Yes.

14     Q      What level is Katie?

15     A      1.

16     Q      And when did you meet?

17     A      We met in 2012.

18     Q      And in any of the years you've known her, do

19  you know what her relationship or her negotiated

20  compensation with any of the TO's or other folks were?

21     A      No.

22     Q      Do you know the hours that she put into

23  judging?

24     A      No.

25     Q      And she lives at your address?

1      A     Yeah.

2      Q     Is she part of the lawsuit?

3      A     Yes.

4      Q     Who talked to you about joining the lawsuit?

5      A     Adam Shaw.

6      Q     Anyone else?

7      A     No.

8      Q     When you work at the store, who tells you when

9   the tournament -- or when you're going to start?

10      A     The store owner.

11      Q     And do they dictate to you what you do while

12   you're there at the store?

13      A     To a degree.  Our job is to uphold the

14   policies put forth by Wizards, so most of what we're

15   doing is already understood before we start working at

16   any given job site.

17            If there's specific things to that job site,

18   sometimes the store owner will ask for additional

19   laborers, like cleaning and things of that nature.

20      Q     Okay.  The Judge's Code; that wasn't written

21   by Wizards, was it?

22      A     The Code of Conduct?

23      Q     Yes.

24      A     I don't believe so.

25      Q     Who wrote it?

1        A       That would have been the Judge Conduct

2    Committee.

3        Q       JCC?

4        A       Yes.

5        Q       And are you on that?

6        A       No.

7        Q       And how are people appointed to the JCC?

8        A       I believe there is an application process that

9    the JCC maintains on a yearly basis.

10       Q       And that's independent of Wizards, correct?

11       A       I'm not sure that it's independent of Wizards.

12   The person who's in charge of it is a contracted

13   employee of Wizards or an independent contractor of

14   Wizards.   They are paid in the interface directly --

15       Q       Who is that?

16       A       Currently Johanna Virtanen, I think.

17       Q       And it's your -- what is your understanding

18   that she's contracted to do at the JCC?

19       A       It is my understanding she's contracted by

20   Wizards to oversee the implementation of the Conduct

21   Code and to adjudicate any disputes or violations of

22   said code.

23       Q       What do you base that understanding on?

24       A       Talking to her.

25       Q       So she's told you --

1    A    Yes.

2    Q    -- that she has a contract with Wizards --

3    A    Yes.

4    Q    -- for the JCC?

5    A    Yes.

6    Q    Have you seen the contract?

7    A    No.

8    Q    When did she tell you this?

9    A    When she got it.

10   Q    When was that?

11   A    Barcelona, so tail end of 2015.

12   Q    What exactly did she tell you?

13   A    That she was approached to do it by someone at

14   Wizards -- I don't remember who -- she said approached

15   her to do it, and they wanted her to oversee both the

16   Player Investigation Committee and the Judge Conduct

17   Committee, and were going to give her a contract to do

18   both, and she was wrestling with whether she was going

19   to do it or not, if she had the time.

20   Q    Was anyone else there when you had the

21   conversation with her?

22   A    No.

23   Q    And this was at Barcelona?

24   A    Yes.  It was at the Regional Coordinator

25   Conference.

1    Q    Have you seen this contract?

2    A    No.

3    Q    And do the stores give you food?

4    A    Sometimes.

5    Q    And you're free to negotiate whatever you want

6    with the store, right?

7    A    Yeah.

8         MR. LINDEGREN:  David; housekeeping.  I don't

9    know that we have a protective order in place, but

10   we're going to need to get one, and if you can

11   agree with me, it would help us not have to argue

12   about coming back and stuff.

13        With respect to the Faturechi things that are

14   confidential, I would like them to be held

15   confidentially while we work it out; in other

16   words, with respect to a protective order.

17        There's a few other things that we may want to

18   do that on, such as your client's 10-99's and

19   things like that; at least give some protection so

20   they're not in the public domain completely, but if

21   we can agree that we will work on a good faith

22   basis to have some kind of a protective order for

23   those items, then we can hopefully do it that way,

24   since I don't think we have one in place, because

25   we haven't gotten any discovery requests from you

1    the regional coordinator list, and if they don't really

2    have something to do with judging per se, I don't really

3    read it.

4              They apparently had sent a copy of the

5    agreement for the regional pro tour qualifiers to the

6    regional coordinator list on April 22nd.

7         Q    So you have a copy of the TO's contract from

8    this event?

9         A    I would have a copy of what they sent out to

10   the stores, yes.

11        Q    Where is it?

12        A    It would be in my e-mail from April 22nd.  I

13   would have produced it because it would have come from

14   Wizards.

15        Q    I don't have it.

16        A    Okay.  But it's also a Wizards-generated

17   document.  Wizards would have it as well.

18        Q    Funny thing, it's always the case, but that's

19   not how discovery works.

20        A    Okay.

21        Q    It's okay.  Don't worry.  We'll figure it out.

22             I didn't read the TO's contract to see if

23   there was a rule about it.

24             Was there a rule about promotional cards?

25        A    Apparently, there was; that they were not able

1    to be given out to anybody other than players.

2         Q    Okay.  But the TO, I guess, violated that

3    rule?

4         A    Yes.

5         Q    And then you sent the card back?

6         A    I did.

7         Q    In the one above from you, again, to Laura and

8    Andy, you are trying to clarify -- in the middle you

9    say:

10              I realize my initial communication makes it

11   seem like it was part of my negotiated compensation for

12   the event.

13              Well, that's true, right?

14        A    Well, I wanted it to be, but then we came up

15   with the idea that, no, it could not be.

16        Q    After you got the card?

17        A    No.  The TO said it wasn't going to be part of

18   it, and he had put it in there, I guess, at the time,

19   and then forgot about it.  It was physically in my

20   compensation, but it wasn't supposed to be.

21              As soon as Wizards contacted me to send the

22   card back, I was like, no problem; I took it out when I

23   realized it was in there, and I can send it back to you

24   guys.

25        Q    How did Wizards find out that you had the

Page 123

1    Q    You don't know how many there were?

2    A    No.  Pro tours, average staff, about 25.

3    Q    But you don't know?

4    A    No.

5    Q    And, again, your contact was Eric Sorenson?

6    A    Yes; for the contract.  Eric wasn't at the pro

7    tour.

8    Q    Okay.

9    A    In person, at the event, my contact would be

10   Scott Larabee.

11        MR. LINDEGREN:  Okay.

12        Let's mark as Exhibit 11 a four-page document.

13   This, again, is a Judge's Service Agreement,

14   appears to be signed by you, sir.  This one is for

15   the Pro Tour M15, August 1 through 3, 2014.

16        (Defendant's Exhibit 11 marked for

17        identification.)

18   BY MR. LINDEGREN:

19   Q    My first question is, is your signature on

20   page three?

21   A    Yes.

22   Q    And do you know what Exhibit 11 is?

23   A    Yes.  It's a contract to work with Pro Tour

24   M15.

25   Q    And this is the agreement you entered with

1    Wizards to provide services at that event?

2         A    Yes.

3         Q    And same question; do you have any records

4    with respect to the services you provided and the time

5    periods in which you provided them?

6         A    No.

7         Q    Did you eat your lunches?

8         A    Yes.

9         Q    Did anyone tell you you couldn't take lunch or

10   a meal?

11        A    No.

12        Q    If you worked past eight hours did you get

13   another meal?

14        A    No.

15        Q    No?  Was that by choice?

16        A    There was nothing in the schedule for us to

17   take a second break.

18        Q    Okay.  Were you allowed to if you wanted to?

19        A    I don't know.

20        Q    Did you ever ask?

21        A    No.

22        Q    What's the longest you worked at this event?

23        A    Ever?

24        Q    At this event.

25        A    I don't recall specifically.

Page 125

```
 1     Q     And you were paid $1,000?

 2     A     Yes.

 3     Q     Did you work all four days?

 4     A     No.  Three.

 5     Q     And you believe that would be reflected in the

 6  records?

 7     A     Yes.

 8     Q     Which records would show you only worked three

 9  of the days?

10     A     There's only three days of a pro tour.

11     Q     Oh, then I'm counting wrong.  I guess it's

12  three.  Okay.  Outsmarted myself.

13           But you worked all three?

14     A     This one I'm not sure I worked all three,

15  because the amount of the contract had to do with how

16  many days you got selected, so the amounts of the

17  contracts before that were a 1,550 figure; those ones

18  were for three days.  Since this one is only 1,000, I

19  believe it was only for the first two days.

20     Q     Your recollection was how much was it per day?

21     A     $500 per day.

22     Q     Is that what it still is?

23     A     Yeah, I understand so.

24     Q     And what is your understanding based on?

25     A     The fee hasn't really changed in five years.
```

1      Q     Okay.  So 500 a day.  So if we do the math

2   then, roughly, that would tell us how many days at each

3   of those you worked?

4      A     Yes.

5            MR. LINDEGREN:  Let's mark as Exhibit 12 a

6      five-page document called Judge's Services

7      Agreement, effective October 1, 2015.

8            (Defendant's Exhibit 12 marked for

9            identification.)

10  BY MR. LINDEGREN:

11     Q     The first question for you, sir, is do you

12  know what this is.

13     A     Yes.

14     Q     What is Exhibit 12?

15     A     This would be my contract to work the World

16  Magic Cup that year.

17     Q     Which year?

18     A     2015.  And to attend the Regional Coordinator

19  Conference.

20     Q     Okay.  So you had an agreement to do both?

21     A     Yes.

22     Q     As an independent contractor, right?

23     A     Yes.

24     Q     And then did you seek counsel on this

25  agreement?

Page 133

1      Q      I'm sorry.  I thought you said you were the

2  head judge.

3      A      I was.

4      Q      Were there any other judges?

5      A      Oh, yes.  There was one; a local judge.

6      Q      And who picked the judge?

7      A      The store.  He was a store employee.

8      Q      Who picked you?

9      A      The store.

10     Q      Then on the most recent exhibit, Exhibit 12,

11  you were paid 3,450?

12     A      Yes.

13     Q      And can you break that down into what days you

14  worked?

15     A      Worked all three of the days at the event;

16  that would have been about 1,500 of it, then the other

17  2,000 would have been my travel and hotel for the

18  Regional Coordinator Conference that took place

19  immediately afterwards.

20     Q      So you were paid for travel and hotel?

21     A      In this case, yes, because there was a

22  conference.

23     Q      Do you have any records of when you were and

24  weren't paid for travel?

25     A      I -- well, all of these contracted agreements

Page 134

1    with Wizards were supposed to be inclusive of that.

2    There was no reimbursement for any other expenses other

3    than this, so I count that as being paid for travel,

4    because it was the only pay I received, and I had to pay

5    for travel.

6        Q    No; my question was a little different.

7            Do you have a record of events where you

8    received travel from somebody and where you didn't?

9        A    There were none.  I was never paid for travel.

10        Q    Other than as part of the independent

11    contractor amount?

12        A    Right.

13        Q    And you presumed that it included the

14    travel --

15        A    Yes.

16        Q    -- because it was all inclusive?

17        A    Correct.

18        Q    And how did you -- were you required to take

19    this assignment?

20        A    No.

21        Q    So it was just voluntary?

22        A    Yes.

23        Q    You were able to turn it down if you didn't

24    want to go?

25        A    Of course.

1      A      Talking to Level 4's.

2      Q      Who?

3      A      Most of the them.  Jared Sylva, Kim Warren,

4  Sean Catanese, Toby Elliott, Sheldon Menery, Jason

5  Lemahieu, Chris Richter, Jeff Morrow, Kevin Dezprez,

6  Ricardo Tessitori, Cristiana Dionisio.

7      Q      So all of them told you face-to-face that they

8  were handpicked and just asked to be an L-4?

9      A      They were asked to be part of it, yeah.  I was

10  very interested in becoming Level 4; that's why I talked

11  to so many of them.

12            None of them could give me a concrete answer

13  on how you became one.  They were sometimes just as

14  confused as the people who weren't L-4, and they were

15  asked by Wizards, and a lot of times given NDA's and

16  things of that nature, so it seemed like it had to do

17  with you being a better fit for their, you know,

18  Organized Play program.

19      Q      Other than what you heard from L-4's, you

20  don't personally know how anyone becomes an L-4, right?

21      A      Correct.

22      Q      And are L-4's compensated?

23      A      I have no idea.

24      Q      Do they have different duties?

25      A      I know the L-4's were compensated for head

1   judging the events.  They were not compensated for the

2   duties that happened outside of events.

3            It was a source of great tension between the

4   regional coordinators and the Level 4's, was that we got

5   contracts as regional coordinators starting in 2014 or

6   maybe 2015, and the Level 4's didn't, so they were being

7   asked to do these outside of event activities to get the

8   opportunities to judge the big events, to head judge

9   them, which they got paid to do, and we were not; we

10  weren't getting paid for outside event work, so there

11  was a big rift.

12       Q     Who asked an L-4 to do work outside of an

13  event?

14       A     Andy.

15       Q     Andy Heckt?

16       A     Yes.

17       Q     How do you know that?

18       A     That's what the Level 4's would tell me.

19       Q     Beyond that, were you part of a conversation

20  where Andy asked someone to work or they didn't?

21       A     I was part of a conversation between Laura

22  Kilgore, Andy, and Adam Shaw towards the end of his

23  tenure as a Level 4, and he was -- they were basically

24  telling him that he needed to do these things for this

25  DCI Family website, which he was saying he didn't have

1    and asked for assistance in locating a judge.

2         Q    Where does an RC have input?

3         A    Wherever they are requested to have input.

4         Q    You are not normally part of the process then?

5         A    No.

6         Q    I thought you told me earlier that you were?

7         A    For Grand Prixes, yes.

8         Q    So Grand Prix is different?

9         A    Yes.   That has a public staff document, the

10   public application process.

11        Q    Well, some of the other ones have an

12   application process too?

13        A    Some of the other ones will use Judge Apps to

14   be the application process, but RC's aren't involved in

15   the staffing decisions at all.

16        Q    Tournament organizer would post that they need

17   judges on Judge Apps, right?

18        A    They can.   They often don't, but they can.

19        Q    How do you know how often they do it?

20        A    Because I see the events that are posted on

21   Judge Apps.   I know how many events are run.

22        Q    If they don't post on Judge Apps, where do

23   they get the judges?

24        A    Usually ones they know personally who have

25   worked for them before, or they contact the regional

1    Florida judges and I had some tournament reports on

2    there.

3         Q    So you listed that as something that a head

4    judge would do, but you haven't done it since 2011?

5         A    Correct; but it's something that many head

6    judges do.  We have a whole section for Tournament

7    Reports on the Judge Apps forums.

8         Q    Do you know who does them and how often?

9         A    Level 2 judges, and at least one a year,

10   because that is the requirement to maintain the level.

11        Q    I'm getting more specific.  Do you know whose

12   done what reports?

13        A    Oh, no.

14        Q    Do you know how much time they spend doing

15   them?

16        A    No.

17        Q    Of the tournaments that you were the head

18   judge, how many were only one judge?

19        A    Probably about 8 to 10 of those 24.

20        Q    Okay.  And those would just be in-store play?

21        A    Yeah, or regional qualifiers, but those are

22   in-store.

23        Q    And you were paid by the store for that?

24        A    Yes.

25        Q    And then of the remaining, what kind of a

1    tournament would that have been?

2        A    That would have been original pro tour

3    qualifiers, which were held in a venue or a large store

4    that had multi judge staff, because there were about 200

5    players.

6        Q    What other kind, if any?

7        A    Star City Open Series I head judged for three

8    or four times.  Those are large, about 4 to 500-player

9    events that are held around the eastern side of the

10   country.

11       Q    Any others?

12       A    No.

13       Q    And when did you do the Star City Open Series?

14       A    I couldn't give you exact dates.

15       Q    You were paid, right?

16       A    Yes.

17       Q    And where is the documentation on the pay?

18       A    I could find it.  It would be in my e-mail, I

19   guess, somewhere, or there would be a check stub that

20   Star City would be able to provide me, or 10-99's.

21       Q    Okay.  Did you produce those?

22       A    I'm not sure.

23       Q    Did you look for them?  Do you remember

24   finding them and giving them to your lawyers?

25       A    I do not.  Not the 10-99's specifically, no.

Page 184

1   Q    Any proof that Star City paid you?

2   A    No.

3   Q    And then the OPTQ; who was running those?

4   A    The RPTQ?

5   Q    Is it RP? I thought you said original.

6   A    Regional.

7   Q    I have never heard of an OPTQ, but I was going

8   with it.

9   A    Regional pro tour qualifier.  Those were put

10  on by Wizards, and the locations were selected by

11  Wizards in advance of the events.

12  Q    Okay.  Who at Wizards ran them?

13  A    Who was in charge of RPTQ's right now?

14  Q    We are talking about 2012 to 2017.

15  A    After Ron Foster took over for GP's for Laura

16  Kilgore, Laura became in charge of the RPTQ and PPTQ.

17  Q    Okay.  How many times were you head judge at

18  an RPTQ?

19  A    Four or five.

20  Q    And were you paid?

21  A    Yes.

22  Q    When you were the head judge at the events

23  with more than one judge, how did you put together the

24  judge staff?

25  A    Usually the tournament organizer would put it

1   together.  They would solicit applications via Facebook

2   or something like that, then the tournament organizer

3   and I would go through the candidates, see who was the

4   most qualified, and take them.

5        Q    Okay.  And then you were responsible for

6   directing the services being provided by the judges?

7        A    Yes.

8        Q    What would you do?  This is at the Star City.

9        A    I would give them their instructions, have a

10  meeting at the beginning of the day, explain what it was

11  their team was going to be responsible for commensurate

12  with the running of the tournament.  I would give them a

13  lot of times their break schedules or at least

14  instructions for creating a break schedule for the

15  lunches, and I would interface with the tournament

16  organizer to see anything they wanted that I hadn't

17  covered.

18       Q    Okay.  And then as the day went, were you

19  responsible for managing the day-to-day,

20  minute-by-minute work of the judges?

21       A    I was responsible for making sure that the

22  event was running on -- you know, in a reasonable

23  fashion, I was responsible for seeing any issues and

24  taking corrective actions, correcting judges that did

25  things incorrectly for maintaining a communication

1    channel between the team leads of the various judge

2    teams to see if they needed anything, but their actually

3    what they did out on the floor, I wasn't in direct

4    supervision, no.

5        Q    And did the TO directly supervise you?

6        A    Yes.

7        Q    They told you what to do minute-by-minute?

8        A    Not minute-by-minute, but they gave me an idea

9    what they wanted the event to be, what my

10   responsibilities were going to be, how their event is

11   run, what things I need to have ready at what time.

12       Q    Then they left it up to you?

13       A    Yes; after that.

14       Q    And then you made the schedules?

15       A    No.  Usually the schedules were made by the

16   tournament organizer.

17       Q    No; I meant the schedules you talked to the

18   staff -- the judges about.

19       A    Breaks.  I would give them around when they

20   could take off to go to lunch, but the schedules of when

21   they worked and under what team they worked was done by

22   the tournament organizer.

23       Q    But you sent people to lunch?

24       A    Yes.

25       Q    And did you give them other breaks?

1      A      If they requested them.

2      Q      And so that's the same for all the Star City

3   ones you were a head judge?

4      A      Yes.

5      Q      Is it the same thing for Wizards?

6      A      I've never head judged for Wizards.

7      Q      Oh, I thought you said you did.

8      A      No.  The regional pro tour qualifiers were

9   Wizards Organized Play program that I was the head judge

10  of at the stores, but any of those contracts that we

11  went through before, none of those were for head judge.

12     Q      So the RPT, regional pro qualifier that you

13  were a head judge on, who were the TO's for that?

14     A      We went through that before.  Cool Stuff

15  Games, Jax Card Games or Jax Games Center, Armada Games.

16     Q      And did it happen the same as with Star City;

17  in other words, your responsibility had you fulfill your

18  services and whatnot?

19     A      No.  It was a little bit different, because

20  that was a Wizards structured tournament, so I would

21  come there as a Level 3 judge, which was required for

22  the tournaments, then my job was to make sure the

23  tournament was run pursuant to the Wizards rules and

24  policies, and I didn't really have much interface with

25  the store owner.  He didn't have a lot of latitude,

1   because there were a lot of rules about the way that the

2   regional pro tour qualifiers needed to be run, which was

3   put out by Wizards.  They put out a fact sheet and rules

4   documents.

5       Q    Any previous to those?

6       A    I didn't.

7       Q    Why not?

8       A    I don't have the ones they sent at the store.

9   They tell them what needs to be done.

10      Q    Well, do you have any?

11      A    I could look.

12      Q    Did you look?

13      A    No.  Anything I produced that came from

14  Wizards, I mean, thousands and thousands of e-mails I

15  gave you.  If there's anything specific you're missing,

16  please give me a list; I would be happy to provide it

17  for you if I have it.

18      Q    Were you the head judge at these RPTQ's or

19  just a Level 3?

20      A    Head judge.

21      Q    You said you were there as a Level 3?

22      A    Well, Level 3 was required.

23      Q    The head judge is the head judge, right?

24      A    Yes.

25      Q    Did you have input into who the other judges

1  were going to be?

2      A    There often weren't any, and no.  In the

3  events that there were other judges, they were ones

4  retained by the store.

5      Q    They didn't ask for your opinion?

6      A    No.

7      Q    Did you create the schedules?

8      A    No; because, again, I was usually by myself.

9  The other times we had a store judge involved in the

10 RPTQ they were a store employee, so they were given

11 their meal breaks and things by their managers.

12     Q    They were being paid as an employee of the

13 store?

14     A    Correct.

15     Q    What store was that?

16     A    That was the Jax Games Center.

17     Q    Who is the employee that was paid?

18     A    Richard Warren.

19     Q    What level is he?

20     A    2.

21     Q    So he was an L-2 helping you judge, and he was

22 paid by the store?

23     A    Correct.

24     Q    And how was he paid by the store?

25     A    I'm unaware whatever region they had.  He was

1    an employee; regular employee of the store.

2        Q    So the RPTQ's, did you ever act as a head

3    judge, whether it was other judges besides you or this

4    employee?

5        A    No.

6        Q    You said there's a structure for an RPTQ?

7        A    Yes.

8        Q    Where is that set up?

9        A    They put out a fact sheet.  Usually they

10    publish it on their website in advance of the event.

11    There is a set of criteria that are given to the

12    tournament organizer, which I only ever received once;

13    that one time that was referenced in the e-mail to Laura

14    in April 2014.

15             There is a -- the magic tournament rules,

16    which are the requirements for any sanctioned

17    tournament, that talk about how many rounds, how long

18    they should be, things of that nature, that we had to

19    follow.

20             And we had specific reporting requirements for

21    the amount of players in the event, the amount of

22    promotional materials given out, because Wizards would

23    account for the remainder when we sent the leftover

24    stuff back.

25        Q    So the fact sheet would set out the number of

```
 1        of the regional blog for USA Southwest regarding

 2        PPTQ's and large events.

 3               (Defendant's Exhibit 22 marked for

 4               identification.)

 5   BY MR. LINDEGREN:

 6        Q    I will ask you first if you've seen this

 7   before.

 8        A    No.

 9        Q    Okay.  PPTQ is what?

10        A    Preliminary pro tour qualifier.

11        Q    Who puts those on?

12        A    Stores.

13        Q    Stores?  Okay.

14               This list says PPTQ Nashville by A1 Comics.

15   That's a TO?

16        A    Yes.

17        Q    And then Channel Fireball, the GP San Jose;

18   did you attend either of those events?

19        A    No.

20        Q    Under that, it says:

21               Staffing and compensation guidelines.  The

22   following guidelines were developed in order to set

23   expectations to help standardize staffing and

24   compensation for preliminary pro tour qualifier events.

25   The goal of standardizing these practices is to help the
```

1   tournament organizers, TO's, and judges more officially

2   organize their PPTQ events.  These guidelines were

3   developed as part of a collaborative effort between the

4   judges of the Southwest region and regional store

5   owners.

6          Have you worked with store owners in the

7   Southeast region to come up with guidelines?

8      A   No.

9      Q   Why not?

10     A   I don't believe that among independent

11   contractors you are allowed to do that.

12     Q   What do you mean?

13     A   You are not allowed to collaborate with other

14   independent contractors to set prices.

15     Q   So you think the southwest -- your buddies in

16   the southwest are violating antitrust laws?

17     A   Maybe, or close to it.  I didn't want to touch

18   it with a 10-foot pole, to be honest with you.

19     Q   Do you have any reason to -- well, do you know

20   who set this up?

21     A   No.

22     Q   It says an effort between the judges and the

23   stores, right?

24     A   It does.

25     Q   Did you have any other involvement in this?

1      A     No.   This is the southwest.

2      Q     I understand; but you have friends in the

3  southwest, don't you?

4      A     I do.

5      Q     Who is the RC for the southwest?

6      A     David Zimet.

7      Q     He is a good friend of yours, isn't he?

8      A     He is.

9      Q     You said he's in California now?

10     A     He is in California.

11     Q     Did you tell Zimet, I think you're violating

12  the antitrust laws?

13     A     No, because I haven't seen this until you put

14  it in front of me.

15     Q     Nowhere on here does it say Wizards had

16  anything to do with this, right?

17     A     I'm not aware that it does.  Again, I'm just

18  seeing it now for the first time.

19     Q     Do you have any guidelines at all for

20  tournament organizers in the Southeast region?

21     A     No.

22     Q     What about the other regions besides the

23  southwest; do they have guidelines?

24     A     Unaware.

25     Q     Don't know one way or the other?

1       A       No.

2       Q       How many regions are there?

3       A       25.

4       Q       More like 8?

5               How many RC's are there?

6       A       25.

7       Q       Currently?

8       A       Yes.

9       Q       In the United States?

10      A       Oh, no.   You didn't say United States.

11      Q       Let's back up and get on the same page.

12      A       Okay.

13      Q       My mind is in the United States, not

14  Rotterdam.

15      A       Okay.

16      Q       In the United States, how many RC's are there?

17      A       8.

18      Q       How many regions?

19      A       8.

20      Q       Thank you for the clarification.

21      A       No problem.

22      Q       So at least for PPTQ's, who sets the

23  compensation?

24      A       Looks like it's negotiated between the judge

25  and the store.

1      Q      How about in your region?

2      A      That way the judge and the store work it out.

3      Q      Okay.  What about other events?

4      A      That way; basically between the judge and the

5  tournament organizer.

6      Q      Okay.  And you've never seen Exhibit 22

7  before?

8      A      No.

9             MR. LINDEGREN:  Let's mark as Exhibit 23 a

10         four-page document entitled Welcome to the

11         Southeast Region of the Judge Program.

12             (Defendant's Exhibit 23 marked for

13             identification.)

14  BY MR. LINDEGREN:

15      Q      The question will be, have you seen this

16  before?

17      A      I believe I read this before, yeah.  I think

18  this is one of the posts that Matt Nunam put on when he

19  created this blog.

20      Q      So this is from the Southeast blog?

21      A      Yeah.

22      Q      And the gentleman you said who created it, his

23  name is at the last page; Your friendly neighbor and

24  Judge, Matt Nunam?

25      A      Yes.

Page 242

1      A    Yes.

2      Q    So each state has a Facebook group?

3      A    Most of them do.

4      Q    So a TO or a store can go on there and post --

5      A    Yes.

6      Q    -- say we are having an event at Karl's Card

7  Shop, I'm looking for judges?

8      A    Yes.

9      Q    Don't go to David's Card Shop.

10     A    Pretty much it does get that dramatic

11  sometimes.

12     Q    Larger events are posted at

13  apps.magicjudges.org, right?

14     A    Yes.

15     Q    That is not a Wizards website, is it?

16     A    It is not.

17     Q    First you will need to apply for the events

18  that you want to get on staff for; right?

19     A    Yes.

20     Q    So no one tells a judge they have to go

21  somewhere?

22     A    No; not to a specific place, but again, there

23  is the requirements of you maintaining your

24  certification and advancing your certificates that

25  requires you to work these events.

Page 291

1     Q     And did your documents you collected include

2   any communications between you and Mr. Shaw?

3     A     No.

4     Q     Why not?

5     A     Because they were done in the presence of

6   counsel.

7     Q     Okay.  Were there any written communications

8   with Mr. Shaw that didn't have counsel?

9     A     No.

10          MR. LINDEGREN:  One thing, David; we need to

11          get a privilege log.

12   BY MR. LINDEGREN:

13     Q     Do you have any other agreements other than

14   the one produced with Star City?

15     A     No.

16     Q     And did you have any agreements with any of

17   the other TO's?

18     A     No.

19     Q     So you only ever had one written contract or

20   agreement with one TO?

21     A     Yes.

22     Q     And all the others just paid you cash?

23     A     Boxes of product usually or cash.

24     Q     And what records do you have of that?

25     A     I don't.  I would have the records of maybe

```
 1                  CERTIFICATE OF OATH OF WITNESS
 2
 3      STATE OF FLORIDA        )
                                ) SS:
 4      COUNTY OF HILLSBOROUGH)
 5
 6              I, KIM AUSLANDER, Registered Professional
 7      Reporter, Notary Public in and for the State of Florida
 8      at Large, certify that the witness, JUSTIN TURNER,
 9      personally appeared before me on April 25, 2017 and was
10      duly sworn by me.
11              WITNESS my hand and official seal this 5th day
12      of May, 2017.
13
14
15
16
17
18
19
20
                KIM AUSLANDER, RPR
21              Notary Public, State of Florida
                at Large
22
23
        Notary #FF184913
24
        My commission expires: 1/10/2019
25
                                                    Page 295
```